## ROWE *v.* STATE

[No. 98, September Term, 1963.]

296

*Decided April 7, 1964.*

*Motion for rehearing filed May 6, 1964, denied May 12, 1964.*

The cause was argued before BRUNE, C. J., and HENDERSON, PRESCOTT, HORNEY and MARBURY, JJ., and reargued before the entire Court.

*Francis D. Murnaghan, Jr.* (on both arguments) for the appellant.

*Mathias J. DeVito, Assistant Attorney General* (on both arguments), with whom were *Thomas B. Finan, Attorney General, C. Burnam Mace, State's Attorney for Dorchester County,* and *Alfred T. Truitt, Jr., State's Attorney for Wicomico County,* on the brief, for the appellee.

HORNEY, J., delivered the opinion of the Court.

The primary questions posed by this appeal arise out of the acceptance by the trial court of the jury verdict of "not guilty of murder in the first degree but guilty of murder in the second degree" on the issue of guilt or innocence despite the fact that the jury had found on the issues of sanity and insanity that the defendant was insane at the time of trial ("insane *now*") in addition to also finding that he was sane at the time of the offense ("sane *then*").

The defendant shot and killed Bronza M. Parks on May 13, 1958. He was indicted for murder within less than a month and pled not guilty. Subsequently, he filed a special plea in writing that he was insane at the time of the commission of the crime. In June 1958, the lower court, pursuant to Code (1957),

Art. 59, § 7, required a pretrial mental examination of the defendant. In September 1958, at the suggestion of the defendant, the case was removed from Dorchester County to Wicomico County for trial. In October 1958, as a result of the pretrial mental examination, counsel for the defendant moved to stay the proceedings alleging that the defendant was unable to understand the character of the charge against him and to assist in the preparation of his defense or to testify on his own behalf. In November 1958, the motion to stay was granted and the defendant was committed to Spring Grove State Hospital until his recovery. In January 1960, he was transferred from Spring Grove to Clifton T. Perkins State Hospital and remained there until July 1962.

During his confinement in Perkins, the defendant wrote the lower court a number of letters in which, among other things, he denied his guilt, insisted that he was not insane, informed the court that he was no longer represented by the attorney who had pled him insane, protested his inability to obtain a change of venue from the Eastern Shore to the Western Shore, and, despairing his ability to obtain effective counsel and a fair trial, offered to change his pleas to *nolo contendere* in order to be transferred to the penitentiary.

At the same time, the defendant continued to assert his sanity to the hospital staff and to seek a certification to that effect from the Department of Mental Hygiene so that he could be tried. In January 1962, the defendant was successful in convincing the staff at Perkins that he was competent to stand trial and that he should be returned to the county jail for that purpose. Accordingly, the superintendent notified the State's Attorney of Dorchester County that the defendant had sufficient mental capacity to advise counsel as to the conduct of his defense and requested that he be transferred from Perkins to the jail at Salisbury to await trial. After some delay in bringing about the transfer (during which *habeas corpus* was sought in the courts of Anne Arundel and Montgomery counties), the defendant was returned to jail in July 1962.

Upon his return to Salisbury, the trial court appointed new counsel to represent the defendant, but when he became dissatisfied with counsel so appointed and demanded the appoint-

ment of other counsel satisfactory to him, the court refused to do so and informed the defendant that any further petitions to the court should be submitted through court-appointed counsel. Subsequently, when the defendant refused to cooperate with such counsel, the court was advised of this fact in a petition for a sanity hearing and therein the court was further informed that counsel believed that the defendant was incapable of assisting in his defense and was insane, and that, for that reason, counsel would decline to present a "justification defense" as the defendant had demanded, because he (the attorney) was of the opinion that the plea of "insane then" was the only defense with a prospect of success. The trial began on February 4, 1963, and lasted five days. After the jury had been selected and sworn, the court conducted a hearing (out of the presence of the jury) and determined, on the basis of the testimony of the superintendent of Perkins, that the defendant was capable of standing trial and dismissed the petition of the court-appointed counsel. Thereupon, counsel for defendant filed an additional special plea of "insane now."

At the trial there was testimony to the effect that the defendant, who had contracted with the victim (a boatbuilder) to rig a skiff as a skipjack, came to the conclusion, after the work was finished and he had been billed therefor, that the boatbuilder had defrauded him. Both parties employed counsel to represent them with respect to the dispute. As the result of a conference between counsel and their respective clients, the defendant with another boatbuilder went to the boathouse of the victim to inspect the skipjack. After inconclusive conversation between the disputants, the defendant left first and was soon joined by the other boatbuilder outside the boathouse, but at the suggestion of the latter, the defendant returned to further negotiate with the victim. It was during this interval that the defendant killed the victim. There were no eyewitnesses to the shooting except the defendant, but the physical facts indicated that a scuffle had taken place and that the victim had struck the defendant with a stick of wood.

Of the nine expert witnesses — eight psychiatrists and one psychologist—five of them testified that the defendant was unable to distinguish right from wrong and to realize the nature

and consequences of his act as applied to himself at the time of the offense, but two of them were of the opinion that the defendant was "sane then." Five of the experts testified as to the the mental condition of the defendant at the time of trial. Three of them were of the opinion that he was either psychotic or did not have capacity to distinguish right from wrong at that time, but one of the three, even though he thought the defendant was still psychotic, was of the opinion that he was competent to understand the charge against him and to participate in his defense. A fourth, who was of the opinion that the defendant was mentally ill but not psychotic, also believed that he was capable of participating in his trial. The fifth stated that the defendant was probably able to go through with a trial. None, however, was of the opinion that the defendant was "sane now." One of the jailers testified that the defendant appeared normal while in jail awaiting trial. Other non-expert witnesses testified as to the abnormal behavior of the defendant prior to the commission of the crime.

At the close of the State's case, counsel for defendant moved for a judgment of acquittal, which was refused. The motion was renewed and denied at the close of the testimony.

In instructing the jury on the issues respecting the pleas of insane at the time of the offense and at the time of trial, the court advised the jury that the test it should apply in determining the mental condition of the defendant *then* as well as *now* was whether or not he had sufficient capacity and reason to enable him to distinguish right from wrong and understand the nature and consequences of his act as applied to himself. The questions as to sanity and insanity were submitted to the jury on two issues: was he "sane or insane then?" and is he "sane or insane now?" The jury was also furnished with a list of possible verdicts ranging from guilty of murder in the first degree to "not guilty," including an additional possible verdict of "not guilty by reason of insanity." Among other exceptions, one was interposed to the instructions because the court failed to inform the jury that it should not return a verdict on the indictment if it should find the defendant sane *then* and insane *now* on the issues. No exception was taken to the fact that the court did not point out a difference between tests for determin-

ing mental condition as of the time of the offense and as of the time of the trial (and the Legislature has never said there is a difference).

The jury found that the defendant was sane *then* and insane *now* on the issues of insanity and returned a verdict on the indictment of "not guilty of murder in the first degree but guilty of murder in the second degree." At the presentence conference in chambers (at which the defendant was present), the trial court decided not to strike out the verdict on the indictment and instead of committing the defendant to a mental institution until he recovered his sanity, it sentenced him to the penitentiary for a term of eighteen years, and stated that the sentence "is to begin as of today," which was February 27, 1963.

The questions presented by the appellant are: (i) whether the evidence produced at the trial was legally sufficient for the jury to have found beyond a reasonable doubt and to a moral certainty that the defendant was sane at the time of the offense; (ii) whether the defendant was denied a speedy trial; and (iii) whether it was illegal, inconsistent or an abuse of discretion to sentence the defendant to the statutory maximum period to run from the date of sentencing. Although an exception was taken to the instructions on the point, no question is raised on appeal as to the failure of the trial court to advise the jury that it should not return a verdict on the indictment if it found on the insanity issues that the defendant was insane at the time of trial. Nor are any questions presented as to the receipt by the trial court of the verdict of guilty of second degree murder or as to the failure of the court to thereafter strike out such verdict. The reasons for these omissions are clear. On instructions from the defendant, court-appointed appellate counsel refrained from presenting any question which might bring about a reversal and a new trial. For reasons best known to himself, the defendant seems to fear the risk of another trial.

As we see it, we need not consider but one of the questions presented by the defendant. Considering them in reverse order, we need not decide whether it was improper to sentence the defendant to the maximum statutory period without any credit for the time he had been incarcerated in jails and mental institutions because, for the reasons hereinafter stated, the defend-

ant should not have been sentenced to a prison. Since we shall hold that the trial was only valid to determine certain issues, we need not consider the question concerning the denial of a speedy trial. As to the question concerning the sufficiency of the evidence to go to the jury on the issue of sanity at the time of the offense, we think that issue was properly presented to the jury because the trial court could not take it away as a matter of law since there was some evidence that the defendant was sane *then*.

Even though a question as to the failure of the trial court to advise the jury with respect to not returning a verdict on the indictment in the event of a finding of insane *now* was not included in the assignment of errors, we think we must, under the unusual circumstances of this case, take cognizance of the plain error *sua sponte*. See *Berman v. Warden*, 232 Md. 642, 646, 193 A. 2d 551 (1963); *Wolfe v. State*, 218 Md. 449, 455, 146 A. 2d 856 (1958); Code (1957), Art. 5, § 16. Cf. Maryland Rule 756 g. And see *Giles v. State*, 229 Md. 370, 387, 183 A. 2d 359 (1962), where, in commenting on the effect of Rule 756 g, reference was made in a footnote to Art. 5, § 16. The failure of the trial court to advise the jury that it should not return a verdict on the indictment if it found the defendant insane at the time of trial, as well as the acceptance of the verdict when the court knew that the jury had determined that the defendant was insane at that time, raises a vital question as to whether certain aspects of the trial were valid.

The statutes concerning insanity as a defense in a criminal case are codified as §§ 7 through 12 of Article 59 (Lunatics and Insane), in the Code of 1957. However, only §§ 7 and 9 are primarily pertinent here.

Although the methods or procedures for determining insanity have been extensively enlarged and improved from time to time in later years, the basic twofold purpose of what are now §§ 7 and 9 (and § 11 with which we are not presently concerned)—to prevent an accused who is mentally incapable of forming a criminal intent from being tried until he has recovered his reason and to protect him from being punished for an offense as if he were sane—has remained substantially the same as when §§ 7 and 9 were originally enacted as §§ 1 and

2 of Chapter 197 of the Laws of 1826. At that time § 1 (now § 7), concerning a person who had been indicted and had plead insanity, provided that the jury empanelled to try him for the offense should by its verdict "find whether such person was, at the time of the commission of such offense, or still is, insane, lunatic or otherwise," and further provided that if the jury should find that "such person was, at the time of committing the offence, and then is, insane or lunatic," then the court was required to commit him to the almshouse or a hospital until he recovered his reason. Section 2 (now § 9), concerning a person who had not then been indicted, provided for the empanelling of a jury "to inquire whether such person was, at the time of the commission of the act complained of, insane or lunatic, and still is so," and in that event, it was further provided that the court, as in § 1, should send him to the almshouse or a hospital.

In 1916, after the lapse of almost a century, when what are now §§ 7 and 9 (but which were then §§ 4 and 6, respectively, of Art. 59 of the Code of 1912), were repealed and reenacted by Chapter 699 of the Laws of 1916,[1] the trial court in which the indictment was pending was clothed with discretionary power and authority in § 4 (now § 7) to order a pretrial examination of the mental condition of the offender by the lunacy commission (which subsequently became the Board of Mental Hygiene but is now the Department of Mental Hygiene). In § 6 (now § 9), where an examination by the lunacy commission was substituted for the outmoded inquest by a jury, the court was further authorized, as it is now, to cause the commission (now the department) "to inquire whether such person is at the time of such inquiry insane or lunatic, or of such mental incapacity as to prevent such person from properly conducting his or her defense or advising as to the conduct of his or her defense." If such is found, the court "shall in its discretion direct such person to be confined" in a mental institution for the care and treatment of the criminal insane "until he or she shall

---

1. The obvious purpose of these amendments was to assure that an insane person indicted for or accused of crime should not be tried, convicted or sentenced so long as he remained insane.

have recovered and shall stay the proceedings * * * until that time, and upon recovery the court shall proceed with the trial of the charge pending against such person."

In 1931, what was then § 6 of Art. 59 of the Code of 1924 was repealed and reenacted by Chapter 436 of the Laws of 1931 so as to provide for a separate trial of the insanity issues, and, if it need be, for a subsequent trial on the indictment with respect to the guilt or innocence of the accused. But two years later the 1931 amendment of § 6 (now § 7) was repealed and reenacted by Chapter 81 of the Laws of the Special Session of 1933, without stating the reason therefor, to read substantially as § 7 of Art. 59 now reads.

Code (1957), Art. 59, § 7, as enacted by Chapter 81 of the Laws of 1933, now provides in pertinent part that:

"Whenever the pleas of insanity * * * shall be interposed * * * the jury impanelled to try * * * [the defendant], or the court shall not be required to state in their verdict that * * * [the defendant] was sane at the time of the commission of the crime, offense or misdemeanor, and/or sane at the time of trial, if they so find, and if the jury or court shall not specifically state in their verdict that the defendant was insane * * * [either *then* or *now*], it shall be conclusively presumed that they found such defendant to be sane * * * [*then* and *now*], as the case may be; provided, however, that in any case where the plea of insanity * * * is interposed the court *shall,* upon the application of the State or of the defendant, or may upon its own motion, direct any jury impanelled to try such case to find specially, by its verdict, whether the accused was sane at the time of the commission of the * * * offense * * * and whether he be sane at the time of trial." [Emphasis added.]

The changes in the law made by Chapter 685 of the Laws of 1949 do not affect the result here.

While some of the text writers and courts (often because of statutory provisions) draw a distinction between the test for determining insanity *then* and the test for ascertaining insan-

ity *now*, it is clear that the statutory law of this state concerning insanity in criminal cases does not now, nor has it ever, specified a test for finding sanity or insanity *then* or *now*. However, since the decision of this Court in *Spencer v. State*, 69 Md. 28 (1888), and perhaps before then, the now familiar M'Naghten test—the ability of the offender at the time of the commission of the offense to distinguish between right and wrong and understand the nature and consequences of his act as applied to himself—has been accepted by the courts of this state as a test for determining insanity in criminal prosecutions. Of course, as a result of the 1916 amendments of §§ 7 and 9 of Art. 59, it is now possible—whenever a pretrial examination of the defendant is requested by the lower court after the filing of an insanity plea, or whenever it appears, or is alleged, or there is reason to suspect that a person charged with the commission of an offense may be insane—to refer the question to the Department of Mental Hygiene for its determination as to whether the defendant or accused is insane or has capacity to conduct his defense or advise as to its conduct. The lower court had occasion to act twice on prior determinations made by the Department.[2] But, because it is explicitly provided in § 7 of Art. 59 that the defendant has a right to interpose an issue of insane *now* as well as a plea of insane *then*, and to *require* the jury to find specially by its verdict whether he was sane *then* and/or is sane *now*, it is the function of the jury (by specific legislative mandate as above noted), when it is the trier of facts, and not the court, to ultimately decide whether the defendant is sane at the time of trial. Furthermore, since the Legislature has not seen fit to provide a dif-

---

2. On the first occasion, following a mental examination at the request of the lower court and his commitment to Spring Grove (from which he was transferred to Perkins) until his recovery, the defendant, upon the advice of the Department of Mental Hygiene that he had sufficient capacity to advise counsel as to the conduct of his defense, was ordered by the court to be returned to Wicomico County for trial. On the second occasion, following the selection and swearing of the jury and a preliminary hearing out of its presence, the trial court, on the basis of the testimony of the superintendent of Perkins to the effect that the defendant was capable of standing trial at that time, permitted the trial to proceed.

ferent test for determining insanity *now,* as distinguished from insanity *then,* and the M'Naghten test has been applied in this state for some seventy-five years, it seems proper for the courts to continue to apply this test until such time as the Legislature changes the same.[3]

Since the primary purposes of the insanity laws are to prevent an insane person from being tried for an alleged criminal offense until he has recovered his reason and to protect him from being punished for an offense committed while insane as if he were sane, *Hamilton v. State,* 225 Md. 302, 170 A. 2d 192 (1961), *Deems v. State,* 127 Md. 624, 96 Atl. 878 (1916), *Devilbiss v. Bennett,* 70 Md. 554, 17 Atl. 502 (1889), it is apparent that the trial court should not have received a verdict on the issue of guilt or innocence when the jury at the same time had found on the issues of insanity that the defendant was "insane" at the time of trial. Moreover, even though the jury had found that the defendant was guilty of murder in the second degree, it is clear that the court had no authority,

---

3. The key elements of the test advocated by the medical profession, particularly the psychiatrists, for determining competency to stand trial is whether the defendant has capacity to understand the proceedings against him, to comprehend his position with reference to such proceedings and to make a rational defense. See Weihofen, *Mental Disorder as a Criminal Defense,* Ch. IX, § 1, p. 431; Lindman and McIntyre, *The Mentally Disabled and the Law,* Ch. 11, Part IV A 1, p. 357. This Court has never been required to decide the propriety of such a test and so far as we know no such test has ever been used in a lower court. The so-called "capacity to stand trial" test (generally statutory in origin) has, however, been applied in other jurisdictions. See, for example, *Overholser v. Lynch,* 288 F. 2d 388 (D. C. 1961), where it was said that "a defendant who is subjected to trial while mentally incompetent to understand the charges against him and unable to assist in his own defense has not really been tried at all, certainly not in the sense of a 'fair' trial, which is the basic element of the due process guaranteed by the Constitution." In *Flynn v. United States,* 217 F. 2d 29 (9th Cir. 1954), *cert. den.* 348 U. S. 930 (1955), *reh. den.* 222 F. 2d 541 (1955), it was said (at p. 30) that "if a defendant is not able to understand the proceedings against him and the nature of the crime with which he is charged, he is not present in court even though his body be there." See also the annotations in 3 A.L.R. 94 and 38 L.R.A. 577.

statutory or otherwise, to ignore the finding of insanity at the time of the trial and to sentence the defendant to a term of eighteen years in prison. On the contrary, it was the duty of the court to refuse to receive the verdict of second degree murder which the jury was without power to render under the circumstances. See *Commonwealth v. Endrukat,* 80 Atl. 1049 (Pa. 1911), in which the factual situation was similar to that of the case at bar. See also *Williams v. State,* 60 Md. 402 (1883), where it was said that when there is a "bad verdict," no judgment can be pronounced since such verdict is a nullity. To the same effect, see *Ford v. State,* 12 Md. 514 (1859).

The law is clear that the finding of the jury that the defendant was "insane" at the time of the trial had the effect of rendering the trial abortive insofar as the finding of guilt was concerned. But, as above indicated, the findings of the jury on the issues of insanity, both *then* and *now,* were, by virtue of explicit legislative mandate, properly received by the trial court. See Art. 59, § 7.

All the law writers at least from the time of Hale and Blackstone to the present time say in effect that a person cannot be required to plead to an indictment or be tried thereon while he is mentally incapacitated so as to prevent him from making a proper defense, and that such person should not be sentenced to imprisonment or otherwise punished while he is so mentally disordered as to be incapable of stating reasons why judgment should not be pronounced. See, among others, *Blackstone's Commentaries,* Book IV, Ch. 2, at pp. 1441-42; Smoot, *Law of Insanity* (1929), § 452, at p. 376; and Orfield, *Criminal Procedure From Arrest to Appeal* (1947), Ch. VI, 8, at p. 280. See also 14 Am. Jur., *Criminal Law,* § 44; and 44 C.J.S., *Insane Persons,* § 127. The reported cases in this state and other jurisdictions are to the same effect. See, for example, *Price v. State,* 159 Md. 491, 151 Atl. 409 (1930), where, in stating the legal effect of a finding of present insanity in a case in which the insanity issues were tried along with the question of guilt or innocence, it was stated at p. 499:

"If * * * [the defendant] be found insane at the time of the trial so as to incapacitate him, the law, out

of a just and compassionate consideration for his condition, will not try him of the crime charged by suffering a conviction to be received, but will stay the charge and await such time when his reason shall be sufficiently restored, so as not to prevent him from properly conducting or advising as to the conduct of his defence, although he may have been of sound mind at the time the alleged crime was committed. The reason for this rests upon weighty considerations, for who knows better than the party charged the facts and the witnesses that may establish his innocence, and these may be his solitary and incommunicable possession by force of his mental condition. It is indisputable that an insane person can not make a rational defence. Again, if a party commit a crime and thereafter and before trial become insane, the law, out of humanity, would not suffer a sentence to be imposed. *So, whether he be sane or insane when the crime was committed, if found by the jury to be insane at the time of the trial, the court would ignore all but this verdict and, staying the trial until such time as the party has recovered his reason, commit him to such place as is best suited to his condition."* [Emphasis added.]

In the *Price* case, where the defense of insanity was raised but the jury rendered a verdict of guilty of murder in the first degree without any findings as to insanity either *then* or *now*, the judgment was reversed and a new trial awarded by a majority of this Court on the theory that the trial court was without jurisdiction to enter judgment and sentence the appellant under the circumstances. Recently, in *Berman v. Warden, supra,* we had occasion to hold that the error of the trial court in *Price* was procedural rather than jurisdictional, but we did not decide that the construction placed on the statute by the majority was incorrect.

In *Commonwealth v. Endrukat, supra,* where the jury had found that the defendant was guilty of murder in the first degree and insane at the time of trial, it was said (at p. 1050 of 80 Atl.) :

"When the jurors to whom the two questions were submitted found that the prisoner was insane at the time of his arraignment and during his trial, they could proceed no further, and they should have returned to the courtroom to have that finding alone recorded. It meant, and its legal effect was, that the prisoner could not be tried on the charge of murder, or on any other that then might have been pending against him. The verdict of guilty of murder in the first degree ought not to have been accepted by the court, but should have been treated as a nullity; for, in view of the finding of the jury of the prisoner's insanity at the time he was put upon his trial, their attempt to try him on the indictment was abortive."

In *Youtsey v. United States,* 97 Fed. 937 (6th Cir. 1899), it was said that "if the jury found insanity to exist [at the time of trial] a verdict of guilty should be quashed."

Furthermore, neither the counsel for the defendant, nor the Attorney General, nor those members of this Court who do not agree with the majority, pointed out a single case in which it has been held that a defendant who is insane should be tried for a criminal offense.

We see no reason to consider now questions which may or may not arise should the defendant recover his reason and be returned to the lower court for trial on the issue of guilt or innocence.

Unfortunately, those parts of the insanity statutes providing for the filing of pleas of insane *then* and insane *now*—the purpose of which is to determine the responsibility of an accused for his alleged unlawful or criminal acts and his capacity to defend himself at a trial therefor—and *especially the effect* of a finding of insane *now,* have not been clearly and certainly defined and delineated. At least two sections of the law have been amended from time to time without clearly expressing in their changed form how one section affects the other or how the amended sections affect other sections of the law that were not changed. As a consequence it is difficult, if not impossible, to state with clarity and precision what the Legislature had in

mind when the statutes were enacted. Hence, it would seem peculiarly appropriate for the Legislature to clarify all aspects of the insanity statutes relating to criminal offenses. The specific mode of doing so is a legislative function and we think we should not express our views as to how this should be done.

> *The findings on the issues of sanity and insanity shall remain as entered but the verdict of guilty on the issue of guilt or innocence as well as the judgment and sentence imposed by the lower court are stricken; and the case is remanded for the entry of an order staying the proceedings and committing the defendant to a mental institution until he shall recover his reason.*

HENDERSON, J., filed the following dissenting opinion, in which BRUNE, C. J., and HAMMOND, J., concurred.

We are unable to agree with the reasoning of the majority of the Court in this case and we think the result both unjust and unsound. A relatively minor objection to the opinion is that it leaves unanswered a question which should be answered. A more serious objection is that it decides the case on a question not presented and on a proposition not advocated by either side. A still more serious objection is that the theory of law upon which the case is thus decided seems quite erroneous.

The opinion correctly states that the appeal presents only three questions: first, whether the evidence was legally sufficient to permit the finding that the defendant was sane at the time of the offense; second, whether the defendant has been denied a speedy trial; and third, whether the trial court erred in imposing sentence without allowing credit for time spent by the defendant in jail or in mental institutions while awaiting trial. Only the first of these questions is decided, and we agree with the majority on that question that there was medical testimony which, if believed, was sufficient to warrant a finding

that the defendant was sane at the time of the offense. It is not our province to pass on its credibility.

With regard to the second question, just why the appellant was not entitled to an answer to his contention that he was denied his constitutional right to a speedy trial, under Art. 21 of the Maryland Declaration of Rights, does not appear. It is generally recognized that where denial of a speedy trial is established an accused is entitled to a discharge or dismissal. See 22A C.J.S., *Criminal Law,* § 468. It would seem that he could properly press this point, even if the verdict of insane now precluded a guilty verdict and sentence, as the opinion seems to hold.

Of course, if the conviction and sentence are nullified, it may well be that the allowance or disallowance of time spent in jail, or in mental institutions awaiting trial, would be premature.

It is our view that we should confine ourselves on this appeal to the questions posed by the appellant and his counsel. If the appellant is capable of appealing at all, it would seem to follow that he is capable of choosing the grounds on which he relies and of abandoning other possible grounds. If, as the opinion states, "for reasons best known to himself, the defendant seems to fear the risk of a new trial," we should not compel him to assume that risk. Surely, the fear is not irrational or unreasonable. If and when he is brought to trial again, he might well be convicted of murder in the first degree and sentenced to death. If, as the majority holds, the verdict and sentence are nullities, it would appear that a claim of double jeopardy would be fruitless. (We shall revert to this later.) In a second trial years later witnesses vital to the defense might conceivably be dead or unavailable. It is our view that he is entitled to stand upon that verdict and sentence, and that this Court should not deprive him of it, *sua sponte*.

The appellant was indicted on June 5, 1958. He pleaded not guilty; and on June 17, 1958, through his then counsel, retained by him, he added a plea that he was insane at the time of the alleged crime ("insane then"). He was then sent to a State mental institution for examination and treatment, if necessary. In January, 1960, he was transferred to the new Clifton T. Perkins State Hospital, where he remained until July,

1962. In January, 1962, the staff at Perkins found that he was capable of standing trial, and the Superintendent so certified to the trial court. Delay ensued. Rowe was transferred to a jail to await trial in July, 1962, but was not tried until February, 1963. Meanwhile, following a habeas corpus hearing in a different court, the trial court appointed new counsel of Rowe's selection to replace his original counsel, with whom Rowe had become dissatisfied. He soon became dissatisfied with his new counsel also and sought his removal. The trial court refused to make a further change in counsel.

On the day of the trial, and out of the presence of the jury, the court conducted a hearing to determine whether the appellant was capable of standing trial. The sole witness was the Superintendent of Perkins. His opinion, based upon a brief interview with Rowe that day and upon his previous knowledge of Rowe for about two and a half years at Perkins, was that he was competent to stand trial. His testimony drew a very clear distinction between the different tests by which to determine sanity to stand trial, *vel non,* and sanity or insanity as regards criminal responsibility. Sanity to stand trial he determined (properly, we think) by the standard stated in Code (1957), Art. 59, Sec. 9, whether Rowe was "at the time of such inquiry insane or lunatic—or of such mental incapacity as to prevent such person from properly conducting his * * * defense or advising as to the conduct of his * * * defense * * *." He expressly declined to express a view as to Rowe's then responsibility under the McNaghten rule, as he had not examined him with that test in mind. On the basis of the Superintendent's testimony, the court found that Rowe was capable of standing trial. At this point, Rowe's court-appointed counsel, whose position must indeed have been most difficult, proceeded to file an additional plea that the defendant was insane at the time of trial ("insane now"), despite Rowe's previous protestations that he was not insane. The case then went to trial.

By what process of reasoning can we reconcile a judicial finding that the accused is able to understand the charges against him and assist in the conduct of his defense, and the action of his court-appointed counsel in forcing him, against his will, to

abandon his contention of "justification," and to adhere to the plea of insanity then filed by his prior counsel, and in raising the additional defense of insane now? The accused had previously told the court he did not wish to plead insanity, and had been informed by the court in no uncertain terms that he could not address the court except through the same court-appointed attorney. Rowe had consistently maintained that he was sane and was ready to stand trial, and there is nothing to indicate any change in his position. With due regard to the difficulties of the situation, we think the court committed reversible error in accepting the plea of insane now without (so far as appears) any further inquiry from the accused, after the court had found him capable of standing trial and hence of advising as to the conduct of his defense. Cf. *Lynch v. Overholser,* 369 U. S. 705. But the question is not before us, because the accused, like Hamlet (who was not mad by English standards), prefers to "rather bear those ills we have/Than fly to others that we know not of." He emphatically does not want a reversal on any ground that calls for a new trial. The majority opinion reaches out to decide that the verdict and sentence are nullified by the finding of insane now, although the question is not a ground of appeal in this Court, and to decide it contrary to the views expressed by both present counsel for the accused and the Attorney General. This curious result is reached by professed reliance upon Code (1957), Art. 5, Sec. 16, and (with the introduction "cf.") upon Maryland Rule 756 g.

To support this curious result the majority cites *Berman v. Warden,* 232 Md. 642, at 646; *Wolfe v. State,* 218 Md. 449, at 455; and Code (1957), Art. 5, § 16, adds "cf. Maryland Rule 756 g," and closes its array of authority with "And see *Giles v. State,* 229 Md. 370, 387, * * * where, in commenting on the effect of Rule 756 g, reference was made in a footnote to Art. 5, § 16." The majority opinion does not trouble to elucidate the matter further, and we think the authorities referred to fall far short of supporting its action.

We are quite unable to detect the relevance of the *Giles* case. In it this Court declined to apply Rule 756 g, even though urged by the defendant to do so. The footnote cited is a mere

reference to § 16 of Art. 5 of the Code and offers nothing to show either its meaning or its pertinence to this case.

In *Berman v. Warden, supra,* which overruled the actual holding of *Price v. State,* 159 Md. 491, we commented that the result reached by the majority in *Price* on a jurisdictional ground might "perhaps" have been reached "upon the doctrine of plain error, or upon the inherent power of an appellate court to correct an error *ex mero motu."* This observation was not necessary to the decision of *Berman,* it was not followed up by any discussion of authority as to such matters, nor was there any need in that case for such discusssion. ·

In *Wolfe v. State, supra,* the trial judge, after denying a motion for a directed verdict (which the judge had made himself in an effort to aid a defendant without counsel), made a comment with regard to the strength of the State's case in chief while advising the defendant as to his right to testify or not to testify. This comment was made ·in an effort to help the defendant in deciding whether or not to testify, but it was made before the jury and its effect was strongly prejudicial. Though this comment was not actually a part of the court's instructions, it had much the same effect as if it had been. Rule 739 g (now 756 g) was relied upon by a majority of the Court to correct a plain error material to the rights of the accused. There, however, the defendant himself sought a reversal and a new trial because of that comment (as well as on other grounds) ; he did not have a new trial thrust upon him.

Rule 756 g deals only with errors in instructions in a criminal case and, *inter alia,* authorizes this Court, on its own motion or the suggestion of a party, to "take cognizance of and correct any plain error in the instructions, material to the rights of the accused even though such error was not objected to as provided by section f of this Rule." The error here found by the majority does not appear to be in the instructions, but in the court's action on the jury's verdict and findings. Furthermore, the Rule cited is a safety valve for the protection of the accused, not a device for his destruction ; and so far as we can discover, in every case (including *Wolfe*) where an effort has been made to invoke it, whether successfully or not, it has been so regarded.

Section 16 of Art. 5, *supra,* affords no more support for the majority's action. It provides that this Court, on a criminal appeal, "shall give judgment without regard to technical errors * * * which do not affect the substantial rights of the parties." Here, the error upon which the majority rests its reversal of the judgment and its order which in effect restores the status quo as if there had been no trial cannot be classified as a "technical" error not affecting "the substantial rights of the parties." No more can it be said that the Court gives judgment "without regard to" that error, whatever its nature. The judgment of reversal is founded on that (unassigned) error, however it may be classified. That it affects substantial rights of at least one of the parties, the appellant, could scarcely be seriously disputed, for the protection against the death penalty (or the permissible alternative of life imprisonment) which the jury's verdict of *not guilty of murder in the first degree,* but guilty of murder in the second degree, gave him, is taken away. In short, a substantial right—quite literally a vital right—is put in jeopardy not by disregarding, but by seizing upon, an error.

Thus, none of the bases cited by the majority seems enough to support its *sua sponte* action. No lack of jurisdiction in the trial court is suggested, nor do we think it could be. Even if its judgment was erroneous, that would not impair its jurisdiction, for the power to hear and decide a case includes the power to decide it erroneously. The majority does not state the constitutional or statutory basis for its action. It seems to us that the Court is actually exercising some unarticulated, supposed inherent power. If this be so, we think that it involves an expansion of our appellate jurisdiction, a departure from the long tradition of this Court, and a venture into a new field, which should not be made, if it is to be made at all, without a clear statement of just what the Court is undertaking to do and the source of its power to do it.

If, as it does, this court, of its own motion, denies to the appellant any right or privilege to elect to submit to the judgment rather than to run the risk of a new trial, it seems to us regrettable that the court does not give any explicit guidance with regard to two questions which seem sure to arise on a new trial. (Cf. Rule 885.)

First, from the majority's view of the nullity of the jury's verdict of not guilty of murder in the first degree, but guilty of murder in the second degree, it seems to follow, as already suggested, that a plea of double jeopardy would be unavailing, even as to murder in the first degree. This is, however, a matter of inference, rather than of direct statement, and the question is a serious one. It has not previously been passed on by this Court, and in comparable situations there is a sharp division of opinion in other jurisdictions. See *Green v. United States*, 355 U. S. 184 (1957) and the catalogue of holdings in other states in Mr. Justice Frankfurter's dissenting opinion (pp. 216-218). Since *Green,* the majority (then 19-17 of the 36 states which had considered the question) has now shifted so as to bar conviction for the major offense charged where the first trial resulted in a verdict of guilty on a lesser offense comprehended in the indictment. The instant case is a stronger one for such a result than *Green,* since here the appellant has not himself sought a new trial and since the jury made an express finding of not guilty of the more serious offense.

The second of the above questions relates to the effect of the jury's finding of sane then. The majority holds that it was proper under the statute for the trial court to receive this finding, as well as the finding of insane now. But is the finding of sane then to be considered on a new trial as *res judicata* or not? If so, what gives this finding greater standing against the finding of insane now than the jury's verdict on the issue of guilt, and is it just to treat this finding as binding against the defendant and to reject the finding in his favor on the issue of murder in the first degree? The majority leaves these questions unanswered.

It would, we think, hardly be a satisfying explanation of the majority's failure to grapple with these problems to say that they may never need to be decided, because the appellant may never regain his reason and therefore may never be retried. Also, silence on the *res judicata* problem can hardly be swept under the rug by merely pointing out that the statute says that the findings on sanity then and now must be made and received, for it does not specify the effect to be given to a finding of sane then when coupled with a finding of insane now.

But passing all this, we are convinced that the Maryland law is not, and should not be, as stated in the quotation from *Price v. State, supra* at 499. We recently took occasion to criticize that opinion in *Berman v. Warden, supra,* decided by a unanimous Court. We flatly overruled *Price* on the jurisdictional point asserted by Judge Parke who wrote the majority opinion. The passage quoted from his opinion states that if the accused is so incapacitated at the time of trial as "to prevent him from properly conducting or advising as to the conduct of his defence," he should not be tried. This correctly states one of the rules laid down by Hale and Blackstone. But it does not follow that "whether he be sane or insane when the crime was committed, if found by the jury to be insane at the time of the trial, the court would ignore all but this verdict * * *." It was Judge Parke's conclusion that because the verdict nullified the trial the court lost jurisdiction *ab initio,* a conclusion we overruled in *Berman, supra.* It is our view that the verdict of insane now interdicts the imposition and carrying out of sentence, but does not in any and all circumstances vitiate everything else in the entire trial.

The majority, we understand, would concede that a finding of insane then, though accompanied by a finding of insane now, would operate as an acquittal of the offense charged. We see no reason why effect should not equally be given to a verdict of not guilty, though based not upon insanity at the time of the offense, but upon self-defense, or upon evidence tending to show that the accused did not commit the act charged, even though the jury might find him insane at the time of trial. See *State v. Wade,* 61 S. W. 800 (Mo.), and *State v. Porter,* 111 S. W. 529 (Mo.), holding that self-defense and insanity then are not inconsistent defenses and that a verdict of not guilty may be based upon either or both. Cf. *Regina v. Roberts,* [1954] 2 Q. B. 329. There the accused was a deaf mute, who had no certain means of communication with counsel. Devlin, J. held that defense counsel might go ahead with the trial on the merits "to test the prosecution's case," without surrendering the right to urge that the defendant was unfit to plead. We also see no reason in a case like the present why effect should not be given to a verdict of not guilty on the most serious charge comprehended in the indictment.

Part of the confusion arises, we think, from the various meanings of the word "insane." One of the established meanings of the term, as used by Hale and Blackstone, was capacity to stand trial, or to comprehend the penalty imposed, and a second meaning was and is that of criminal responsibility, or capacity to form a criminal intent, now embodied in the McNaghten rule adopted in Maryland in *Spencer v. State,* 69 Md. 28 (1888). McNaghten was tried in 1843 and acquitted. The propriety of the instructions given to the jury was the subject of debate in the House of Lords, and the Judges rendered opinions thereon. The Maryland statutes now under consideration, Code (1957), Art. 59, sec. 7 (and Code (1963 Supp.), Art. 59, sec. 8), were originally enacted, long before the McNaghten rule was formulated, by Chapter 197, Acts of 1826, and were based on 39 and 40 Geo. III, Chapter 94 (1800). In Carr, *Suggestion of Insanity in Criminal Cases,* p. 9, it is noted that the English Statute was enacted after one Hadfield had been acquitted in 1800 on the ground of insanity, and "it was doubted if at common law there was jurisdiction in a court of oyer and terminer to confine a prisoner after acquittal, even if insane." In this context, the word quite clearly imports a third meaning, whether the prisoner, if released, is likely to be a danger to himself or to others. This test, as well as the criminal responsibility test, we have recognized and applied in *Salinger v. Superintendent,* 206 Md. 623, 630, where the appellant sought release from a mental institution following commitment after a criminal trial at which he had been found insane then and insane now. He claimed to have recovered his sanity under the McNaghten rule. This was not enough for his release. In *Hamilton v. State,* 225 Md. 302, 307, we pointed out that in Chapter 197, of the Acts of 1826, there was no provision for a pre-trial examination of a defendant who had pleaded insanity, but there was a provision for empanelling a jury, now replaced by the provisions of sec. 7, which call for examination by the Department of Mental Hygiene to determine capacity to stand trial. Cf. *Tull v. State,* 230 Md. 596, 602.

Of the three tests prescribed which we consider here [1] it

1. Other types or tests of insanity or lack of mental capacity familiar to the law, but not here involved, pertain to capacity to

seems clear to us that capacity to stand trial should now be determined by the court alone after referral to the Department of Mental Hygiene, that criminal responsibility is the only test under the plea of insane then, and that the plea of insane now (if it can properly be described as a plea) raises issues of present liability to punishment or of commitment to a mental institution. The plea of insane now cannot conceivably relate to criminal responsibility at the time of the act, nor can it logically be applied to overrule the medical experts and the court on the question of capacity to stand trial.

An examination of our statutes and of the changes made therein from time to time seems to strengthen our view on this matter. Under Ch. 197 of the Acts of 1826 the questions of sanity or insanity then and now were to be tried by the jury empanelled to try the case. Ch. 699 of the Acts of 1916 added a provision authorizing the court to have a preliminary mental examination of the accused to be made by a commission which was a predecessor of the Department of Mental Hygiene, and permitted the commitment of the accused on such examination instead of on a jury's finding. The *Price* case, decided in 1930, produced major revisions of the law by Ch. 436 of the Acts of 1931. A preliminary determination of insanity then "and/or" now was to be made by a jury specially empanelled for that purpose (which was not the jury to try the question of guilt). Provision was made for all possible combinations of findings on insanity then and now, and the provision for a preliminary mental examination by a commission was omitted. The provisions of the prior law held "jurisdictional" in *Price* could no longer have such effect. The 1931 Act was, however, short lived, perhaps because of the burden of dual jury trials. By Ch. 81 of the Acts of 1933, Special Session, which is substantially the same as Sec. 7 of Art. 59 of the 1957 Code, the jurisdictional holding of *Price* continued to be effectively nullified, but new provisions avoiding the *Price* holding were en-

---

execute a valid deed or contract (or will) or to attend to one's business affairs, and capacity to testify as a witness. As to the latter, see *Johnston v. Frederick,* 140 Md. 272, 275; *Contee v. State,* 229 Md. 486, 491.

acted under which the jury empanelled to try the case was again (and still is) to determine sanity then and/or now ("and/or" being the statutory term). By the same statute, provision for a preliminary mental examination by a State agency (now the Department of Mental Hygiene), which might be ordered at the discretion of the court, was restored. We think that the purpose of this examination is the same as that of the examinations provided for under Secs. 9 and 11 of Art. 59 of the Code (1957) (see *Hamilton v. State, supra,* 225 Md. at 307), and is clearly to determine the capacity of the accused to stand trial. The statutory criteria for that differ markedly from those for determining criminal responsibility.

This was made perfectly clear at the trial by the testimony of the Superintendent of Perkins, just as he had made it clear at the hearing on capacity to stand trial. The court's advisory instructions to the jury relating to the defense of insanity now were based on the test of criminal responsibility, just as were those relating to insanity then. The difference between the two tests was further and fully considered at a post trial and pre-sentence conference between the court, counsel and the defendant, (the last of whom did not, however, make any statement) when the propriety of receiving and acting upon the verdict as to guilt was thoroughly discussed.[2] Defense counsel took no position then, but both the court and counsel for the State took the view that the determination of capacity to stand trial had been settled by the preliminary hearing—a perfectly logical and proper position, we think. Very plainly, capacity to stand trial was not submitted to the jury. The majority opinion either equates the two kinds of insanity or denies any significance or relevance to the separate test of capacity to stand trial.

In short, as we see the matter, we simply have two materially different tests, and the answer under one, we think, is not and should not be determinative of the answer under the other, and we see no need to construe our present statute as requiring such a result.

---

2. At this conference the problem of double jeopardy on a new trial was clearly recognized and extensively discussed. Both the court and the two State's Attorneys thought that this defense would apply as to a charge of murder in the first degree.

This precise question was fully discussed by Chief Judge Bond in his dissenting opinion in *Price,* in which he was joined by Judges Urner and Offutt. He said (p. 507) : "Would the right of a court to try a case be made dependent upon a finding reached at the end of the trial and by means of the trial? * * * Assuming the crime to have been committed within the geographical limits, the court has full power and jurisdiction to try a man who may in the end prove to be, in the opinion of the jury, insane now. The jury's finding of insanity now, so reached as a result of trial, would be a perfectly well-founded, valid one, and the trial would not be nullified by it. On the contrary, the finding would merely give the court an additional duty, as under the English and other statutes, to order the man confined. * * * It might be said that not only does jurisdiction not depend upon the additional finding one way or the other, but it produces the finding." In *Berman v. Warden, supra,* we have followed Judge Bond's views on the above jurisdictional issue.

Chief Judge Bond further said: "* * * the only question which might possibly need to be decided to determine the rightfulness of going through with any trial would be the question whether the man is in a mental condition to go on. But that question would seem to be no more jurisdictional than a question whether a man is physically fit to go on, or whether he is too sick. * * * It is to be borne in mind, however, that when, before or during trial, any question arises of mental capacity of a particular defendant to proceed, the prescribed method for determining that capacity is not the trial itself. * * * when any question arises of the capacity of the accused to conduct his defense or advise on its conduct, the question is referred to the Board of Mental Hygiene and settled by it.

Judge Offutt, in his separate dissenting opinion, said (p. 514) : "* * * the jury should have been told that, if they found that the accused was insane at the time of the offense, they were empowered to return a verdict of 'not guilty by reason of insanity at the time of the offense.' Whether he was sane or insane at the time of the trial was a collateral and an independent fact, having no necessary connection with his guilt or innocence, but which the jury were authorized to decide, not as

bearing upon that issue but for the guidance of the court in disposing of the accused."

As we have tried to demonstrate, a jury's finding of insane now can have no reference to criminal responsibility, nor should it operate retroactively to vitiate the trial. The very findings of sane then and insane now depend upon the trial for their validity. The practical results of a contrary view are also unfortunate. It may well be as was testified by some of the psychiatrists, that the ever present fear of future prosecution is a major impediment to recovery, particularly where, as here, no credit was allowed against the maximum sentence for time spent in the mental institution, and none may be allowed in a future trial.

For all of these reasons, we think the three points raised by the appellant should be decided. We have stated our agreement that there was sufficient evidence to sustain the finding of sane then. We also think that it was also sufficient to sustain the verdict of second degree murder. We should be disposed to hold that there was no denial of the right to speedy trial under the circumstances. We think, however, the accused is entitled to credit for the time spent in the mental institution pending trial, against the maximum sentence imposed, as he would clearly have been after sentence (cf. *State v. Ewell*, 234 Md. 56), and that he is entitled to stand on his refusal to seek a new trial. With this modification we should affirm the judgment. If he ought to be committed because of danger to himself or to society because of his mental condition, this should be done through other procedures. Cf. *Lynch v. Overholser, supra.*

It is our hope for the future that the Legislature will step into the breach to cure what, to us, is an anomalous result. We think they should specifically provide, as has been done in other states, that time spent in jail or in mental institutions pending trial should be allowed against sentence, where disallowance extends the maximum time. The idea that the question of fitness to stand trial should be resolved retroactively by a jury, or passed on by a jury at all, is unsound. The present statutes clearly authorize prisoners suspected of being insane to be transferred to mental institutions, with credit for time spent there, and persons guiltless of a crime can be committed

upon the certificate of two physicians. In 5 Wharton's, *Criminal Procedure* (Anderson's Ed.), sec. 2023, it is said: "on such inquiry [capacity to stand trial] there is no right to a jury trial except when conferred by statute."

A possible solution, in addition to the above suggestion, might be to amend secs. 7 and 8(a) of Art. 59 of the present code so as: (1) to provide expressly for a hearing and determination by the court alone, either of its own motion or upon application of either party, to determine in advance whether the accused is mentally capable of standing trial (a procedure which we think is permissible under the present statute, and which was followed in this case) ; (2) to eliminate provisions for a finding by the jury as to the accused's sanity at the time of trial; (3) to provide that when a defendant has pleaded guilty by reason of insanity, but that defense fails and he is found guilty, he may, before sentence is imposed, be committed to a mental institution for examination, evaluation, and report, upon application of either party or by the court of its own motion; (4) to provide that if such report shows that the defendant is, by reason of mental disease or defect, incapable of understanding punishment or the reason for it, sentence shall be deferred and he shall be recommitted to a mental institution; and (5) to provide that if such report shows that the defendant is mentally capable of understanding punishment, but is, by reason of mental disease or defect, a danger to himself or to the safety of others, he may be sentenced and at once committed to a mental institution as if the examination had been made and the prisoner transferred pursuant to sec. 43 of Art. 59 of the Code (1957). Under these suggestions no change would be made with regard to the jury determining a defendant's sanity or insanity at the time of the offense, or in the provisions of sec. 8(b) of Art. 59, enacted by Ch. 43 of the Acts of 1963 relating to the commitment for examination and evaluation of persons found not guilty by reason of insanity.

We trust that the above suggestions may prove of some assistance to the General Assembly in finding the best solution to a problem which both the majority and the minority of the Court agree calls for legislative consideration and, we think, corrective action.