### GILES ET AL. *v.* STATE

[No. 312, September Term, 1961.]

*Decided July 18, 1962.*

*Motions for rehearing and to stay mandate filed August 16, 1962, rehearing denied and stay granted, September 19, 1962.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, HORNEY, MARBURY and SYBERT, JJ., and HARRIS, J., Chief Judge of the Fourth Judicial Circuit, specially assigned.

*Stedman Prescott, Jr.,* and *Hal Witt* for the appellants.

*Robert C. Murphy, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General, Leonard T. Kardy, State's Attorney for Montgomery County,* and *James Cromwell, Assistant State's Attorney,* on the brief, for the appellee.

Brief of *amici curiae* filed by *Edward L. Genn, Lawrence Speiser, Charles A. Horsky* and *Richard S. Arnold* for the National Capital Area Civil Liberties Union and the American Civil Liberties Union.

HORNEY, J., delivered the opinion of the Court.

James V. Giles and John G. Giles were found guilty by a jury of raping a sixteen-year old girl and were sentenced to death. From the judgment and sentence entered on the verdict they have appealed to this Court.

About midnight on July 20, 1961, Joyce Roberts and Stewart Foster and two other young men went to a secluded spot in Montgomery County near a dam on the Patuxent River to go swimming. But when other friends they were expecting did not appear, they started to leave and ran out of gas. Joyce and Stewart remained in the automobile while the other two young men set out to get gas.

Shortly thereafter when the stranded man and girl saw three young colored men (the Gileses and Joseph Johnson) approaching, Stewart became alarmed and rolled up the windows and locked the doors. The trio first demanded money and cigarettes, but were told by Stewart that he had neither. One of the intruders, using obscene and vulgar language, threatened to drag the man out of the automobile and carnally know the girl. And when Stewart refused to turn the girl over to them and warned them they would get into trouble, one or more of them threw rocks at the automobile, shattering the windows, and reached in and unlocked the doors. As Stewart jumped out of the automobile to hold off the attack he was struck in the face with a rock and knocked unconscious. At the same time Joyce, not knowing that Stewart had been knocked out, got out of the other side of the vehicle and fled into the woods. She had gone only a short distance when she tripped and fell. She remained where she fell in the underbrush trying to hide.

After this episode, the evidence as to what took place is conflicting. Joyce testified that the several acts of intercourse were forcibly had against her will and without her consent. On the other hand, John denied that he had ever had intercourse with the girl. And James, though admitting intercourse, claimed that it was with her consent.

According to the girl, John was the first to find her. He laid on top of her until James and Joseph also arrived. In the meantime she pleaded with John to let her go farther into the woods to avoid being found by the other two and told him that he could follow her later. She thought that if she could get away from him she could get away from all of them. After discovery by the trio, although they neither threatened her at

that time nor beat her, they leaned over her and began kissing her, and one of them reached for the zipper on her shorts. She protested but was told "either you do it or we will do it." She thought it would be senseless to scream or struggle to get away, and, knowing that she was alone in the woods with three demonstrably violent young men and afraid for her life, she complied with their demand and removed her own shorts and laid them aside. She was then subjected to successive rapings, first by John, then Joseph, and finally James. During the final attack, she heard Stewart, who had regained consciousness, cry out that he was going for the police, but before she could call to him for help, she heard him running off.

According to John, he followed the girl into the woods, though he claimed he did not then know that she was a woman. Although she suggested that he could, he did not have intercourse with her. They sat in the woods five or ten minutes and kept quiet to avoid being found by James and Joseph. The girl told him that if he would help her get away, she would let him have intercourse with her. He attempted to help her by keeping quiet, but when they moved they were heard and their whereabouts discovered by the other two with the aid of the girl calling to them. She told them she knew what they wanted and disrobed herself to the waist and stipulated the order in which they were to have intercourse with her. [The girl told the police that John had not had intercourse with her and repeated what she had told the police at the preliminary hearing, but at the trial, though admitting that she had previously stated that he had not, she testified that she had not told the truth and that John too had had sexual relations with her on the night in question.]

According to James, he went into the woods only to look for his brother John and not for the girl. She called him over to where she was, took her clothes off and insisted that he have intercourse with her. He did not know whether John had had intercourse with the girl.

When Stewart regained consciousness, he heard Joyce "whimpering" in the woods and immediately made his way to the home of a nearby resident to have the police called. Ser-

geant Alton Duvall arrived on the scene within a few minutes, and the young men fled. The police officer and Stewart found the girl lying on the ground, practically naked, sobbing and in a dazed condition. But when she was seen by the nearby resident as she came out of the woods, she appeared to him to be calm, cool and collected. A physical examination revealed that the girl had abrasions on her shoulders, knees and legs and that she had recently had sexual intercourse.

James, having spent the night hiding in the woods, was arrested at his home the next morning, but John, who had spent most of the intervening time hiding in the woods, was not apprehended until two or three days later. In statements to the police following their arrest, James admitted that he had thrown rocks at the automobile; that he had chased the girl into the woods; that he argued with his brother as to who would be first to have intercourse with her; that he had intercourse last, after John and Joseph; and that he was having intercourse with the girl when the police car arrived. John, in his statement, admitted his presence at the scene of the crime; that he had chased the girl into the woods; but denied that he had had intercourse with her.

Seven questions are presented by the appeal. We shall consider them, not in the order presented, but in what appears to us to be a logical sequence.

(i)

The appellants contend that it was prejudicial error *per se* and a violation of their constitutional rights not to have had a member of their own race on the jury panel. The claim is without merit.

The record discloses that the defendants, instead of challenging the array of prospective jurors at the outset of the trial, in accordance with the accepted practice, moved, at the very end of the trial, for a mistrial because there were no Negroes on the jury panel which tried the case. We think the objection may have come too late to raise a question as to the composition of the jury, but that is a question we need not decide, for even if it is assumed, without deciding, that the question was not waived, there was no evidence that Negroes

had been intentionally excluded and, which is more important, there was no showing of any prejudice whatsoever to the defendants. Indeed, they concede it could not be shown that members of the Negro race had been systematically excluded from previous Montgomery County jury panels.

When the absence of Negroes from a jury panel is not by design, a defendant is not thereby denied a fair and impartial trial. See *Jackson v. State,* 180 Md. 658, 26 A. 2d 815 (1942) ; *Zimmerman v. State,* 191 Md. 7, 59 A. 2d 675 (1948), *aff'd.* 336 U. S. 901 (1949). And cf. *Rayne v. Warden,* 223 Md. 688, 165 A. 2d 474 (1960), *cert. den.* 365 U. S. 854 (1961). The subject was exhaustively discussed by Judge Soper in *U. S. ex rel. Jackson v. Brady,* 133 F. 2d 476 (4th Cir. 1943), *affirming* 47 F. Supp. 362 (D.C. Md. 1942), *cert. den.* 319 U. S. 746 (1943), *reh. den.* 319 U. S. 784 (1943), where it was held that a colored citizen charged with crime has no constitutional right to have his race represented on a trial jury and the mere fact that no Negroes were on a particular jury panel does not prove that they were excluded because of their race.

### (ii)

The appellants insist that the trial court should have asked the prospective jurors on their *voir dire* a question they requested: "Have any one of you any bias or prejudice against a defendant who is a Negro, when the complaining witness .s a white woman?" But instead of the proposed question, the court asked: "Do you have any bias or prejudice with respect to the Negro race such as would preclude you from giving a Negro a fair and impartial trial as you would a white man?"

While the court might well have asked the proposed question, we do not think that failure to do so deprived the defendants of a jury that was competent and qualified to try them. Since the only purpose of a *voir dire* examination is to probe for the existence of cause for disqualification, we think the general question asked was sufficient to determine whether any juror was biased or prejudiced for or against the defendants and whether his mind was free to hear and impartially

consider the evidence and render a fair and impartial verdict thereon. See *Garlitz v. State,* 71 Md. 293, 18 Atl. 39 (1889). Cf. *Kujawa v. Baltimore Transit Co.,* 224 Md. 195, 167 A. 2d 96 (1961).

In *Lee v. State,* 164 Md. 550, 165 Atl. 614 (1933), *cert. den.* 290 U. S. 639 (1933), this Court approved a *voir dire* question designed to ascertain whether the prospective jurors could "give the defendant [a Negro] as fair and impartial a trial as [they] could a white man, and give him the same advantage and protection as you would a white man upon the same evidence," and then added that "this is all the traverser, white or colored, is entitled to receive." We see little distinction between the intent and purpose of that question and the result sought to be obtained by the question asked in the instant case. Clearly, both were designed to elicit all that a defendant is entitled to probe for in a case such as this—the possible existence of cause for disqualification on account of racial bias or prejudice. Cf. *Contee v. State,* 223 Md. 575, 165 A. 2d 889 (1960).

The question asked by the trial court was sufficient to disclose racial bias and prejudice. See *Humphreys v. State,* 227 Md. 115, 175 A. 2d 777 (1961). And see the cases collected in the Annotation, *Juror—Racial or other Prejudice,* 54 A.L.R. 2d 1204, 1210, *et seq.* Furthermore, the general question asked removed the necessity of also asking the more specific one. *Glaros v. State,* 223 Md. 272, 164 A. 2d 461 (1960).

(iii)

The defendants have raised two questions with respect to rulings on the evidence.

First, they dispute the correctness of the refusal to permit the prosecuting witness to testify on cross examination whether she had ever had a venereal disease and whether her parents allowed her to go out late at night. The sustaining of the objections to these questions was not improper. While the rule is that when consent is asserted as a defense in a rape case, the *general* character or reputation (as distinguished from *specific* acts) of the prosecuting witness with respect to chastity

or unchastity is admissible, the questions as framed did not go to her general character or reputation for chastity.

The first question (relating to a venereal disease) would certainly have also permitted a probing into *specific* acts, and, even if it had been answered in the affirmative, it would have had no probative value on the issue of consent. If in fact the prosecutrix had a venereal disease, she could have contracted it from the defendants; or by means other than intercourse; or by a single previous sexual experience with another, an inquiry into which is forbidden by the rule in *Shartzer v. State,* 63 Md. 149 (1885), to the effect that a prosecutrix cannot be asked whether she had previously had intercourse with a person other than the accused. And see the recent case of *Humphreys v. State, supra,* which reaffirmed and reapplied the *Shartzer* ruling. See also the annotations in 65 A.L.R. 410 and 140 A.L.R. 364, which point out that Maryland follows a different rule from that in some of the other states with respect to cross examination as to prior immorality and unchastity.

The second question (relating to the keeping of late hours) also has no probative value in determining prior character or reputation of the prosecutrix for unchastity. Such an inquiry —like the question in the *Humphreys* case with respect to the reputation of the prosecutrix for having associated with colored men—would not give rise to an inference, even if true, that she was unchaste. We think this question as framed was clearly objectionable as to substance, but even if it is assumed that the inquiry was aimed at the reputation of the prosecutrix for staying out late at night (and not at the reputation for having parents that allowed her to do so), the question was nevertheless a collateral one that was irrelevant under the *Humphreys* ruling, and was therefore properly excluded. Cf. *State v. Brown,* 241 N. W. 591 (Minn. 1932). Moreover, since the defendants made no attempt to follow up the disputed question with one that might have been admissible or make a proffer of what they intended to establish by the objectionable question, they cannot now be heard to complain. It is for this reason that the case of *State v. Franklin,* 79 S. E. 2d 692 (W. Va. 1953), relied on by the defendants, is not authority on which to base a holding of prejudicial error in this case.

The second of the evidence questions concerns the refusal of the trial court to permit the defendants to interrogate Lt. Lloyd M. Whalen on direct examination about a prior statement allegedly given by the officer to a newspaper which was inconsistent with his testimony at the trial. The claim is that the court improperly limited the impeachment of the witness and that such action constituted reversible error. Such is not the case; and, since the contention is wholly without merit, our comments will be brief. The defendants could not impeach a witness (hostile or not) they had called as their own, without first showing to the satisfaction of the court that they were taken by surprise or had been entrapped, which they concede they could not do because the alleged inconsistent statement had not been made to the defendants, or their attorney, or to some person to be communicated to them. See *Bruce v. State,* 218 Md. 87, 145 A. 2d 428 (1958), and the cases therein cited. And cf. *Parker v. State,* 227 Md. 468, 177 A. 2d 426 (1962).

(iv)

The defendants contend that the trial court should have directed a verdict of not guilty because the evidence was insufficient in law to sustain a conviction. The contention is without substantial merit.

There was some evidence tending to indicate consent on the part of the prosecuting witness, which, if believed by the trier of facts, would have been a complete defense to the charge of rape. But there was also evidence of violent acts and verbal threats on the part of the defendants, which, if believed, would have been the equivalent of such force as was reasonably calculated to create in the mind of the prosecutrix an apprehension of imminent bodily harm that could have impaired or overcome her will to resist. See *Hazel v. State,* 221 Md. 464, 157 A. 2d 922 (1960), where it was said (at p. 469) : "There is, however, a wide difference between consent and a submission to the act. Consent may involve submission, but submission does not necessarily imply consent. Furthermore, submission to a compelling force, or as a result of being put in fear, is not consent." Since there was legally sufficient evidence from which the jury could find as it did, the question, as to

whether the intercourse had been consented to or had been accomplished by force, was clearly one to be resolved by the trier of facts, and the case was therefore properly submitted to the jury.

(v)

The defendants further contend that Section 5 of Article XV of the Constitution of Maryland, providing that the jury in criminal cases shall be judges of the law as well as the facts, violates the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States. We think not. The defendants, though recognizing that the same contention (at least insofar as due process was concerned) was made, but was rejected by this Court, in *Slansky v. State,* 192 Md. 94, 63 A. 2d 599 (1949), request us to reexamine the holding of that case.[1] There, in holding that the constitutional rights of the defendant had not been abridged, we pointed out that the due process clause of the Fourteenth Amendment does not require the states to conform their criminal procedure to that of the federal courts, but left the states free to work out their own systems of criminal procedure as they had done for many years both before and after the adoption of the amendment, and cited such cases as *Bute v. Illinois,* 333 U. S. 640 (1948); *Fay v. New York,* 332 U. S. 261 (1947); *Foster v. Illinois,* 332 U. S. 134 (1947); and *Jackman v. Rosenbaum Co.,* 260 U. S. 22 (1922). The question, after an exhaustive review of the historical basis for the state constitutional provision and the cases and other authorities on the point, was carefully considered in the *Slansky* case and we see no reason to reach now a conclusion contrary to what we reached then. So far as we are advised, the Supreme Court of the United States has not rendered any decision since *Slansky* which would now require a different result from that there reached by this Court.

We recognize, of course, as we did in *Slansky,* that all other

---

1. The holding in *Slansky v. State,* 192 Md. 94, with respect to the constitutional question here involved was reaffirmed in *Hopkins v. State,* 193 Md. 489, without elaboration.

states (with the exception of Maryland and Indiana [2]) have either done away with or trimmed down the concept of a jury being judge of the law as well as the facts. But we were of the opinion then, as we are now, that § 5 of Art. XV is not unconstitutional and that we are not bound, absent a decision of the Supreme Court to the contrary, to follow the rulings in other jurisdictions with respect to similar constitutional provisions in other states, even though some of the cases [3] have held that a state may not permit juries to determine the law in criminal cases without violating the Constitution of the United States.

The provision of § 5 of Art. XV of the Maryland Constitution that "[i]n the trial of all criminal cases, the Jury shall be the Judges of Law" [4] has not been construed as all inclusive, and some limitations upon its scope have been recognized ever since its adoption. Thus, for instance, in *Franklin v. State,* 12 Md. 236 (1858), it was held that the jury had no right to pass upon the constitutionality of a statute and that it was proper for the trial court to prohibit counsel from arguing that question before the jury. Trial courts have always passed and still pass upon the admissibility of evidence the jury may consider on the issue of the innocence or guilt of the accused. *Vogel v. State,* 163 Md. 267, 162 Atl. 705 (1932); *Dick v. State,* 107 Md. 11, 68 Atl. 286 (1907) and 107 Md. 21, 68 Atl. 576 (1908); *Beard v. State,* 71 Md. 275, 17 Atl. 1044 (1889); *Bell v. State,* 57 Md. 108 (1881); *Wheeler v. State,* 42 Md. 563 (1875). Though it was not required to do so until recently, a trial court has always had the right to give an

---

2. Since the decision in *Slansky,* Indiana has modified by judicial interpretation the concept that a jury has an "exclusive" right to determine the law in criminal cases. See *Beavers v. State,* 141 N. E. 2d 118.

3. See, for example, *Pierce v. State,* 13 N. H. 536; *State v. Burpee,* 65 Vt. 1; *Commonwealth v. Anthes,* 5 Gray (Mass.) 185.

4. Rule 739 b, in effect when this case was tried, provided that the jury should be told that it was the *final* judge of the law in every case in which advisory instructions were given, but the word "final" was omitted from section b of the revised and renumbered Rule 756 that became effective January 1, 1962.

advisory instruction as to the law. See, among others, *Beard v. State, supra,* and the line of cases therein cited. In *Luery v. State,* 116 Md. 284, 81 Atl. 681 (1911), this Court went even further and recommended that a trial court should give instructions whenever requested or whenever the court considered it desirable even though not requested. Moreover, it is the duty of a jury to decide a case according to the established rules of law, and if it should misapply the law to the prejudice of the accused, the trial court has the power to set aside the verdict and grant a new trial. *Beard v. State, supra.* And, which is equally (if not more) important to the accused, an erroneous instruction, if it is seasonably objected to, is reviewable by this Court. See, for example, *Swann v. State,* 64 Md. 423, 1 Atl. 872 (1885). But what was said in *Vogel v. State, supra,* the principle of which is now incorporated in Maryland Rule 756 e (formerly Rule 739 e), with respect to the right of the trial court to defer giving instructions until the conclusion of the argument and thus preclude counsel from arguing to the contrary, undoubtedly did more to make the constitutional provision less effective than any prior decision of this Court. See the comment with respect to the *Vogel* case by Prof. Mark DeW. Howe in *Juries as Judges of Criminal Law,* 52 Harv. L. Rev. 582, fn. 125, at p. 614. Additional safeguards were instituted in 1950 when the State Constitution (§ 5 of Art. XV) was so amended as to give this Court the power to review the sufficiency of the evidence to sustain a conviction when a question with respect thereto is properly reserved in the trial court. See *Shelton v. State,* 198 Md. 405, 84 A. 2d 76 (1951), and *Yanch v. State,* 201 Md. 296, 93 A. 2d 749 (1953). To implement the right of the trial court under the amendment to pass upon the sufficiency of the evidence in the lower court, a supplementary statute, now codified as § 593 of Art. 27 of the 1957 Code, was enacted, under which (and former Rule 738 now Rule 755) the trial court, at the request of the defendant, may direct a verdict in his favor [5] and the defendant is afforded the right of appeal should

---

5. Rule 738, in effect when this case was tried, permitted a defendant to move for an instruction or for a directed verdict based

the trial court refuse the requested instruction. See *Auchincloss v. State,* 200 Md. 310, 89 A. 2d 605 (1952). And Rule 756 b (formerly Rule 739 b) makes it mandatory for the trial court to give an advisory instruction whenever it is requested. We think the existing procedure in this State for the trial of criminal cases, including as it does the provision by which the jury in such cases is the judge of the law as well as the facts, is not such as to deprive a defendant of adequate means of protecting his rights in a trial before a jury. Historically, the purpose of the constitutional provision was not to curtail the defendant's protection.[6] Furthermore, where full use is made of all presently available safeguards, it may be difficult, in practical operation, to distinguish between the *power* of a jury (under binding instructions) to render a verdict and the *right* of a jury (under advisory instructions) to determine the law for itself in reaching a verdict.

While it is true that in the *Slansky* case, we were primarily concerned with a claim that due process had been violated, we see no reason in this case, where the claim of unconstitutionality is also based on an alleged denial of equal protection, why the holding here should be different from the holding there.

---

on the insufficiency of the evidence, but the revised and renumbered Rule 755 that became effective January 1, 1962, provides that a motion for judgment of acquittal shall be used in the place of the motion for a directed verdict of not guilty and the motion for an instruction that the evidence is insufficient in law to sustain a conviction which have been abolished.

6. The historical origin of the constitutional provision and the distinction between the power of the jury to apply the law to the facts in a criminal case and the right of a jury to determine the law as well as the facts has been discussed by the bench and bar of this State on many occasions during the last three decades. See, for example, Markell, *Trial by Jury—A Two-Horse Team or a One-Horse Team?,* 42 Md. St. Bar Ass'n Rep. 72; Dennis, *Maryland's Antique Constitutional Thorn,* 92 Pa. L. Rev. 34; Henderson, *The Jury as Judges of Law and Fact in Maryland,* 52 Md. St. Bar Ass'n Rep. 184; Prescott, *Juries as Judges of the Law: Should the Practice be Continued,* 60 Md. St. Bar Ass'n Rep. 246. See also the debate on the subject in 39 Md. St. Bar Ass'n Rep. 71, *et seq.,* and the note in 1 Md. L. Rev. 175.

In the first place, we think it was implicit in *Slansky* that neither clause had been violated. But regardless of that, it seems clear in this case that the defendants were afforded that fundamental fairness which is required by the due process clause, and that they were not subjected to a trial different from that given to other defendants in like circumstances which is forbidden by the equal protection clause. For here— where the issue was principally one of fact and the weight of the evidence and credibility of the witnesses were also matters for the jury to determine—we find nothing in the record to indicate, even though no instructions as to the law were asked for or given, that the jury did not correctly apply the law to the facts in the performance of its constitutional duty.

(vi)

There is also a contention that the defendants were denied due process and equal protection of the law by the failure of the trial court to give an advisory instruction as to the law even though the defendants made no request therefor. This contention, like that in point (v), also lacks merit. The claim here is that even if a jury may determine what principles of law are to be applied in a criminal case, it may not in a capital case be left without any instruction as to the law. But the claim overlooks the fact that a defendant may waive his right to require an instruction in a capital case as he may in any other criminal case.

As noted herein, Rule 756 b makes it mandatory upon the trial court to advisorily instruct the jury as to the law at the request of either party. Section f of the rule further provides that a party may object to the failure to give any instruction or an inadequate one. But in this case neither the State nor the defendants requested an instruction or objected to the failure of the court to give one as to the law. The only statement made by the court to the jury at the close of the evidence — which was certainly not an instruction though it is designated that in the record—merely informed the jury that it could render any one of three verdicts.

Although there is nothing in the record to so indicate, it may be assumed that the State's Attorney as well as the de-

fendants, who were represented by an able and experienced attorney, deliberately chose not to request instructions or object to the failure to give them, in order to be in a position to argue the law of the case to the jury without prior or subsequent instructions by the court contrary to what they anticipated arguing or had already argued to the jury. Cf. *Schanker v. State,* 208 Md. 15, 116 A. 2d 363 (1955). But be that as it may, since there was no objection to the absence of an instruction, there is nothing before us to review. Rules 756 g and 885; *Lane v. State,* 226 Md. 81, 172 A. 2d 400 (1961), *cert. den.* 368 U. S. 993 (1962); *Reynolds v. State,* 219 Md. 319, 149 A. 2d 774 (1959); *Bulluck v. State,* 219 Md. 67, 148 A. 2d 433 (1959).

While Rule 756 g [7] permits this Court of its own motion to take cognizance of and correct any plain error material to the rights of the accused even though not included in the assignment of errors, we are unable to say that the failure to request an instruction or to object to the failure to give one under the circumstances in this case was such an error as this Court ought to take notice of. See *Martel v. State,* 221 Md. 294, 157 A. 2d 437 (1960), *cert. den.* 363 U. S. 849 (1960), where we had occasion to point out that whatever other meanings the term "plain error" might involve, it does not include appellate alleviation of such unfortunate consequences as may result from a choice of trial tactics. See also *Canter v. State,* 220 Md. 615, 155 A. 2d 498 (1959), and *Madison v. State,* 200 Md. 1, 87 A. 2d 593 (1952).

Furthermore, even if it is assumed that the defendants had a constitutional right to have the jury instructed as to the law, it is clear that in a case such as this, where they were represented by competent and experienced counsel, even constitutional rights may be waived by not asserting them. *Lenoir v. State,* 197 Md. 495, 80 A. 2d 3 (1951). See also *Heffner v. Warden,* 211 Md. 638, 126 A. 2d 304 (1956), *cert. den.* 353 U. S. 914 (1957), a *habeas corpus* proceeding, in which the same contention as that presented here was raised and rejected.

---

7. See also the provisions of Code (1957), Art. 5, § 16.

388

(vii)

The final contention that the sentence was excessive is likewise without substance. Since the penalty was one of those prescribed by the statute, it is not excessive, and there is no basis for a reversal for that reason. *Merchant v. State,* 217 Md. 61, 141 A. 2d 487 (1958).

*Judgments affirmed.*