404 F.Supp. 1360 (1975)
UNITED STATES of America
v.
David GUILLETTE et al.
Crim. No. H-524.
United States District Court, D. Connecticut.
April 18, 1975.
*1361 Paul E. Coffey, Sp. Atty., Dept. of Justice, Hartford, Conn., for the U. S.
Hubert Santos, Hartford, Conn., for defendant Guillette.
James A. Wade, Robinson, Robinson & Cole, Hartford, Conn., for defendant Joost.
C. Thomas Zinni, Boston, Mass., and Charles P. Ferland, Danielson, Conn., for defendant Zinni.

RULING ON MOTION FOR A NEW TRIAL
CLARIE, Chief Judge.
David Guillette, Robert Joost, William Marrapese and Nicholas Zinni were convicted after jury trials, on an indictment charging in three separate counts: (1) an unlawful combination and conspiracy to deprive Daniel LaPolla of his civil rights, resulting in his death on September 29, 1972, a violation of 18 U.S.C. § 241; (2) attempting by force and violence to intimidate and impede a witness in a Court of the United States, in violation of 18 U.S.C. § 1503; *1362 and (3) using a dynamite bomb to commit a felony, namely, the injury by force of a witness in a Court of the United States, so as to impede, obstruct, and influence the administration of justice in violation of 18 U.S.C. § 1503 and in violation of 18 U.S.C. § 844 (h) (i). The defendants Guillette and Joost were convicted after a jury trial before the undersigned at Hartford; while the latter two were convicted after a jury trial before Judge Murphy at Waterbury. The effective sentence imposed in all four cases was life imprisonment. All defendants appealed their convictions, but on February 20, 1975, counsel for the defendant Marrapese filed a voluntary withdrawal of his pending appeal. He then proceeded to testify as a Government witness at the court hearing on the motion for a new trial, concerning his own participation in the purchase of the recantation of the prosecution's principal trial witness, informant-Housand. Marrapese openly admitted his own involvement in the conspiracy and testified that the other defendants, except Zinni, had actively participated in the LaPolla conspiracy, which resulted in the latter's death.
The motions of defendants Guillette and Joost for a new trial were denied on the day of sentencing, March 7, 1974; and similar motions by Marrapese and Zinni were denied on June 26, 1974, the date of their sentencing. On July 1 and July 19, 1974, respectively, the latter two defendants moved for a new trial based on newly discovered evidence and the prosecutor's suppression of material evidence. These motions were denied after hearing, on October 24, 1974; and their motion to submit further evidence concerning prosecutorial misconduct was also denied, on October 29, 1974, by Judge Murphy.

Case Background
Guillette and Joost filed a third motion for a new trial on October 3, 1974. They alleged that the Government had failed to timely provide defendants' counsel with exculpatory evidence as required under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), together with Jencks Act material under 18 U.S.C. § 3500. They asserted that the principal prosecution witness, Housand, had perjured himself by not disclosing Government promises made to him; and by denying that he had previously received psychiatric evaluation and treatment; and finally that the Government had failed to timely produce relevant[1] fingerprint evidence, which was exculpatory in nature as to them.
On November 13, 1974, the credibility of the Government's principal informant, John A. Housand, became highly questionable, when he appeared at the office of the United States Attorney in New Haven in the company of Attorneys Andrew A. Bucci and John A. O'Neill, Jr., former defense attorneys in the case, to recant the substance of his trial testimony. Informant Housand proceeded to dictate, on tape, an unsworn statement and to respond to questions put to him by the United States Attorney.[2] He conceded that he himself had been an active participant in the original conspiracy to kill LaPolla, for which crime he had received immunity from prosecution by the Government. He not only denied the truthfulness of his own trial testimony, but affirmatively accused the Special United States Trial Prosecutor at Hartford, the Chief Attorney of the New England Criminal Strike Force, at Boston, another assigned Assistant United States Attorney, several special Treasury investigating agents, and certain United States Marshals, of knowingly conspiring to suppress the true facts by falsely manufacturing evidence against the defendants and by aiding in the giving of false evidentiary information in court.
*1363 Housand represented that from the time he first testified before the Grand Jury that indicted these defendants, and throughout both trials, he had been led and rehearsed in the false testimony by Government attorneys and agents. He claimed that the four convicted defendants (including Marrapese) had been set up and framed. He stated that the key conspiratorial meeting at Carter's Jewelry Store on May 8, 1972, to which he had previously testified and concerning which he was subject to extensive cross-examination, had never occurred. He related how two ATF agents had represented at his first interview with them while he was an inmate at the North Carolina prison, that the Government would pay him $5,000 for his cooperation and testimony. He claimed that these same agents insisted, however, that no mention of this monetary remuneration should be divulged at trial. He complained that the Government has since refused to pay him the promised sum and that he stood ready and willing to testify in Court, that the Government representatives had suborned perjury, whenever a hearing on the motion for a new trial would be scheduled.
After the taped recantation, Housand was subpoenaed to appear before a Grand Jury on December 3, 1974, for the purpose of testifying under oath, concerning the taped testimony and being subjected to further examination. At the time of his Grand Jury appearance, he was being detained under bond as a material witness and was represented by court-appointed counsel. At his first appearance before the Grand Jury, he exercised his fifth amendment rights[3] and refused to testify. On December 6, 1974, at his own request he again appeared before the Grand Jury and testified in substance to the recantation of his trial testimony. He reiterated his accusation of suborning perjury against the Government prosecutors and their investigating agents. After interrogating several witnesses, the Grand Jury indicted both Housand and Attorney Bucci, together with several other named defendants, in Criminal Case No. H 74-185, charging them with conspiring to obstruct justice and suborning perjury. This original indictment was later dismissed upon the Government's own motion on March 21, 1975; and it was superseded by a new indictment, H 75-39, wherein only the informant Housand and Attorney Bucci were named as co-defendants.
On March 24, 1975, Housand wrote to the Court, (with a copy to his counsel) requesting a severance in Criminal No. H 75-185, giving as his reason that much of his testimony would be against the other defendants named in the indictment, excluding his wife. An attached accompanying letter was addressed to United States Senator Talmadge of Georgia, to whom Housand stated, ". . . interested parties located your writer and forced him to return to Connecticut, where your writer recanted previous testimony." These flagrantly contradictory positions taken by Government-informant Housand, cause this Court to look with searching and guarded scrutiny concerning his truthfulness and what weight, if any, should be given his trial testimony against these defendants, who stand convicted.
When Housand appeared at the court hearing scheduled for presentation of evidence on the new trial motion for the defendants, Guillette, Joost, and Zinni, Housand's counsel moved that the Court order a mental examination of Housand before his counsel should be required to advise him on whether or not he should testify. The motion was granted and Dr. John Donnelly, the Psychiatrist-in-Chief at The Institute for Living in Hartford, was appointed to conduct this psychiatric examination. The doctor spent 30 hours reading reports, records and the trial testimony of *1364 Housand; and he interviewed him for a total of approximately 8 hours on 4 different occasions for purposes of psychiatric evaluation, before submitting a written report.[4]
Dr. Donnelly's findings disclosed that Housand was not psychotic; that he understood the nature of the proceedings in his present legal situation; and was fully able to assist counsel in his own defense. (Dr. Donnelly Tr. 52, 53). He found that Housand had a personality disorder with an antisocial personality and that he had a capacity for the manipulation of people; and a faculty of being evasive and misleading, without it being apparent. Dr. Donnelly concurred in that part of the opinion expressed in a report by Dr. Henderson (former Chief of Staff of the Lutheran Medical Center, in Omaha, Nebraska, who had treated Housand in July, 1965) that Housand's ability to lie was fantastic. (Dr. Donnelly Tr. 70). Dr. Donnelly also testified that he had questioned himself a long time on the issue of whether Housand could be classified as a "pathological liar." His final decision was in the negative, because by definition a pathological liar is one who tells falsehoods for the pleasure of it and usually cannot remember later what he has said. However, the Doctor did agree that Housand had a fantastic ability to lie. (Dr. Donnelly Tr. 94) (Dr. Henderson Tr. 15). Dr. Donnelly found Housand not mentally ill, to the extent of having incapacitating emotional symptoms, such as psychosis or neurosis; however, he did find that his personality structure, from a mental health point of view, was pathological. (Dr. Donnelly Tr. 87).
At the Noble Met hearing, which was conducted outside the presence of the jury and limited to the issue of whether evidence concerning the commission of a prior similar act, the using of an explosive device, should be admissible as evidence against the defendants Joost and Guillette, Housand was specifically asked whether or not he had ever been previously examined or treated by a psychiatrist. He responded unequivocally that he had not. He also denied that he had ever applied for psychiatric help, either while in the military or in prison. (Tr. 309). His only reference to such contact was as it related to classification procedures when being admitted or processed in prison.
Throughout both trials, Housand's credibility was constantly under attack. His testimony was crucial in establishing the conspiratorial meeting on May 8, 1972, at Carter's Jewelry Store in Cranston, Rhode Island, which involved the four defendants as active participants. Without that meeting, it would have been difficult, if not impossible, to prove that all four had agreed to actively participate in carrying out the plan to do away with LaPolla, as set out in Count 1 of the indictment. It became clear that the reliability of this Government-informant, as the prosecution's principal witness, could in the last analysis become finally determinative of the guilt or innocence of these defendants.
Thus it was of critical importance during both trials that Housand flatly denied that he had ever been examined or treated by a psychiatrist, when in fact his actual medical and psychiatric history disclosed objective facts to the contrary.[5] In fact, it became an effective method of closing the door to further cross-examination by defense counsel in the area of his prior mental illness and his potential as a perjurer and embellisher of the truth.
The records disclosed that Housand had been ordered hospitalized at the United States Navy Hospital for a medical-psychiatric evaluation at Guam, in July, 1954. The purpose was to determine his mental responsibility after he *1365 had been charged with larceny in a military court martial proceeding. His medical history as contained in these records, disclosed two nervous breakdowns during the two previous years and a record of his experiencing fainting spells, with periods of loss of memory under stress. He claimed to have experienced these symptoms since having been accidentally hit on the head with an axe as a child. The final diagnosis was "emotional instability" (hysterical anxiety).
His medical history also disclosed that Housand had psychiatric evaluation at the Psychiatric Clinic, Lachland Air Force Base in Texas, on October 30, 1956. The findings were that he had a personality disorder, namely, emotional instability reaction, manifested by impulsive acts, emotional lability and poorly controlled hostility with anxiety and guilt feelings.
During the cross-examination of Housand at the Noble Met hearing, Government counsel was reminded that he had a continuing duty under court order throughout the trial, to divulge any reports the Government had or knew about concerning the treatment for psychiatric problems of any Government witness. At that time the prosecutor denied having any such information. (Tr. 310). However, during the course of the trial, medical and psychiatric reports of this nature did come into the possession of the Government prosecutor, which were part of the military court martial records.[6] From that time on, although he had such material information in his file, through a claimed oversight, he failed to discover and disclose them to defense counsel or to the Court. He explained at the new trial hearing, that he had not in fact read through all of this supplemental data, but was primarily interested in reviewing the criminal record of Housand's convictions.[7]
A further disclosure was filed with the Court by the Government which came to the Government's knowledge after the hearings on the defendants' third motion for a new trial; and it became Court Exhibit 18 by stipulation with defense counsel. No claim was made that anyone connected with the Government had any prior knowledge of the report's existence. It reveals a psychiatric examination on September 14, 1965, by a Dr. Edward T. Beitenman, of Omaha, Nebraska.
The report revealed that informant Housand, who had just been discharged as a patient at the Lutheran Medical Center on August 6, 1965, was interviewed at the County Jail at Omaha, Nebraska, because of his own insistence that he needed psychiatric treatment. It revealed further some of the contradictions of his mental makeup.[8] He acknowledged to Dr. Beitenman his previous treatment by Dr. Henderson, whom he stated, knew what a disturbed person he was. Housand acknowleged that Dr. Henderson had described him as a psychopathic liar, but assured Dr. Beitenman, that although he had lied to Dr. Henderson, he would not lie to him.
Dr. Beitenman recited in summary form the history given to him by Housand, and made the following findings of his impression:
"Mr. Housand does represent a definite personality trait disturbance. His diagnosis is an emotionally unstable personality. When placed under stress, his judgement would be poor and his relationships with other people are continuously fraught with fluctuating emotional attitudes, because of strong and poorly controlled hostility, guilt and anxiety. He has a tremendous need to be noticed by people, and often times will become overly dramatic. Sometimes, this type of *1366 person resorts to suicidal threats and gestures, which fortunately are in many cases as fleeting as their various moods. He reports that he had intensive psychiatric counselling while in prison, and I doubt whether any long-term psychiatric program would help him."
The Court finds that informant Housand's trial testimony, to the effect that he had never asked for or received psychiatric evaluation or treatment was completely false. The factual informa-contained in the military records, the Lutheran Hospital records and Dr. Beitenman's report establish the contrary facts with objective certainty. Timely knowledge by defense counsel that the Government's informant and chief witness was described in available psychiatric reports as a compulsive liar is a fact which might well have been crucial to defense counsels' effective cross-examination of Housand.

Perjury & Non-Disclosure of Psychiatric Information
When Housand testified before the Grand Jury on December 6, 1974, he admitted for the first time, the fact that his mental health condition had been examined and evaluated by the military at the United States Naval Hospital on Guam, in 1954, and also that in 1965, he had been a private patient in a psychiatric hospital in Omaha, Nebraska. He represented that he had advised the Government prosecutor of these facts and the latter allegedly said, "Well, we can't very well give this to the defense because they would have very  it would be a good thing to discredit you[9]." All the Government prosecution agents testified unequivocally to the contrary, that such a conversation never occurred; and this Court finds that such an alleged discussion never happened.
The Lutheran Medical Center Report[10] disclosed Housand's psychological evaluation and treatment as a psychiatric patient during the 27-day hospitalization period from July 10, 1965 through August 6, 1965. Dr. Henderson's hospital memoranda[11] disclosed that the patient came to him wanting help and he found after examination that Housand had a personality trait disturbance and was emotionally unstable. Dr. Henderson noted that Housand was a "story teller" and that he had a fantastic ability to lie. (Dr. Henderson Tr. 13). He described him as a man who "could get grandiose ideas; he would build situations . . . when that sort of thing collapses, he doesn't learn from it; he sets it up again . . . ." (Dr. Henderson Tr. 27). All of this is consistent with his military history record, as disclosed in defendants' Exhibit 5Z, subparagraph 5(d), page 6 of the Review of the Staff Judge Advocate, where it said, "His ability cannot be effectively utilized by further military service because he is an habitual prevaricator."
The psychologist's report, of Housand, prepared while he was hospitalized and being evaluated at the Lutheran Medical Center, stated that underneath, Housand may well be a "schizophrenic." When he was discharged as a patient, it was noted that he was "not improved." (Dr. Henderson Tr. 13-17). The Court finds that Housand knew during his stay in that hospital he was undergoing psychiatric treatment and he was fully aware, that as a patient, he was receiving prescribed medication for his condition. The doctor testified that during his hospital stay, his mood did improve, but not his story telling.
The Court finds that all of his psychiatric information[12] was denied to the defense primarily by reason of Housand's perjured testimony, wherein *1367 he unequivocally denied that he had ever previously been examined or treated by a psychiatrist. Furthermore, the trial prosecutor testified that after Housand's military records with their attached medical-psychiatric data had come into his possession, while the trial was in progress, his attention was primarily centered on Housand's criminal convictions and he had no recollection of having seen the psychiatric data or considered its materiality. He conceded that defendants' Exhibits 1 through 6 were never disclosed to defense counsel and neither was defendants' Exhibit 23Z, except the face-sheet. (Coffey Tr. 90-93, Feb. 14, 1975).

Failure of Government to Disclose Brady Material
The defendants' Exhibit 23Z disclosed on pages 24-28, that Housand pleaded guilty before a special court martial on June 4, 1956, to an information with three charges; and the third charge recited ten separate specifications of making and uttering fraudulent checks. On each one of the copies of these checks, the name of the maker appeared thereon as "John L. Housand." The prosecutor conceded that this data was in his file during the trial, at the time when the following testimony was educed:
"Question: How about John Levon Housand? Did you ever use that?
"Answer: We have been on that before. I don't recall using that `L.' I don't.
"Question: Is it a mistake?
"Answer: I never used it."
(Coffey Tr. 211, Feb. 18, 1975).
At a prior occasion, during the Noble Met proceedings, the following colloquy had occurred:
"Question: Have you ever been arrested or convicted under any name other than Stephen Longval, John Joseph Howard, or John L. Housand?
"Mr. Coffey: I object to the last one, your Honor. The witness testified he had never been convicted under the name of John L. Housand. Mr. Santos asked him about his rap sheet, and whether he ever used that name. And the witness said no.
"The Court: What was the name, Counselor.
"Mr. Coffey: John L. Housand. As I recall Mr. Santos' inquiry on Friday, he asked him whether John L. Housand was one of the names he was known as, and he said no."
(Coffey Tr. 220-221, Feb. 18, 1975).
Had the Government counsel timely revealed to defense counsel,[13] as he was under a duty to do, the latter could have used this documentary evidence to establish objectively before the jury, the witness' deliberate lack of truthfulness in other essential matters. This opportunity might also have assisted defense counsel in establishing a stepping stone in the potentially persuasive argument, "falsus in unus falsus in omnibus." Had the Court been made aware of Housand's background of mental illness, it might well have ordered its own psychiatric examination of him by a court-appointed doctor.[14] Instead, the Government had this information in its file and through oversight did not disclose it, even to the Court.

Housand's Letters as Brady Material
The defense counsel have also alleged broad claims, that several of the letters written by informant-Housand to the prosecutor and to the ATF agents prior to the first trial should have been disclosed to them as "Brady Material" or as least filed with the Court "in camera," for an evaluation and ruling. These letters, including some which were written after the Hartford trial, but before *1368 the Waterbury trial, are presently defendants' exhibits or court exhibits[15] and have been subject to the Court's review. The Court finds that the letter dated March 22, 1974[16] sent by Housand to ATF Agent Petrella should have been considered by the Government to have been discoverable. The relevant part of that letter read:
"Sal: . . . I fully intend to fulfill my obligation insofar as testifying, but you known there is a `way' of testifying, and truly testifying."
The significance of this correspondence was that Housand suggested that the truthfulness of his testimony in the courtroom was not beyond his manipulation and embellishment. The credibility of this informant was crucial to the Government's proof that a conspiracy existed. The contents of that letter conceivably could have led a capable defense attorney to develop Housand's personal motivations and demonstrate that they were designed to further his own personal interests. Such probing might conceivably have destroyed the jury's belief in Housand's other testimony. Since this letter was written after the Guillette-Joost trial, but before the Zinni trial, potentially it could only have infected the latter trial. The letter was in the same category of damaging evidence as Defendants' Exhibit 30Z, which was voluntarily disclosed by the prosecutor prior to the first trial. There were several other letters written in the Spring of 1974, which alluded to Housand's request for more Government maintenance money. These letters should have been filed with the Court as potential "Brady Material," to enable the Court to decide on their disclosure. However, the Court finds that no material harm flowed from this omission, in light of the Government's ultimate disclosure to defense counsel of such maintenance sums at the Waterbury trial. The Court finds that all others of such letters, including the Christmas card to Agent Petrella, were not discoverable and none of the defendants experienced any harm from their non-disclosure.

Failure to Disclose Government Promises
The Court finds that the defense was not harmfully prejudiced by the prosecutor's failure to timely disclose the promises alleged to have been made to the informant Housand. Some of this information was originally disclosed orally and then supplemented in writing. However, the check cashing scheme and the breaking and entering of the home in Rhode Island were never revealed until the Noble Met hearing during the trial. This unusual circumstance gave defense counsel an adequate opportunity to pursue the subject on cross-examination in the presence of the jury. (Coffey Tr. 37-40, Oct. 3, 1974). The Court does not condone this dilatory procedure; however, in this instance it did not in fact materially harm the defense.
The Court further finds that the Government did not make any specific affirmative promises of immunity to the informant Housand which were concealed from the defense. (Coffey Tr. 22-35, Oct. 3, 1974). The prosecutor conceded, however, that it was implicit during the Government's pretrial questioning of Housand, it was not the Government's intention to prosecute him for those crimes which he voluntarily revealed, as a result of his giving a history of his association with the defendants and thereby cooperating with the Government. It would have been much better practice, however, for the Government to have disclosed in writing to defense counsel this "implicit understanding" even in the absence of the Government's making any specific promise of immunity. (Coffey Tr. 66, Oct. 3, 1974). It seems apparent in this case, that due *1369 to the physical proximity of the Public Defender's Office and the Prosecutor's Office on the second floor of this building, the mutually relied upon discovery procedures were too informal.

Notes of ATF Agents
The Court finds that the random memorandum notes taken by ATF Agents Weronik and Petrella at the Brooklyn Jail interview on September 18, 1973, were but summary observations as to the events discussed with informant Housand. They were not the adopted words and thoughts of Housand, but rather those of the agents. They were clearly not § 3500 material, which required disclosure. See, Palermo v. United States, 360 U.S. 343, 350-351, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959).

Fingerprints
In light of this Court's ordering a new trial on other sufficient grounds as hereinbefore stated, and considering Judge Murphy's findings in respect to the issues raised, no constructive purpose would be served by this Court's treating the subject of fingerprints further.

Housand's Recantation Statement
After reviewing the totality of the record, the Court finds that there is no credible evidence to support informant Housand's accusation that Government prosecutors and agents conspired to frame and convict these defendants by unlawful means. The Government made a bona fide effort to solve the commission of this heinous, cowardly crime against society; and except for the errors of judgment as hereinbefore stated, the Court finds no unlawful prosecutorial conduct.

Discussion of the Law
The motions for a new trial were filed pursuant to Rule 33, Fed.R.Crim.P. The rule provides in relevant part:
"The court on motion of a defendant may grant a new trial to him if required in the interest of justice. . . . A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case."
Since appeals were pending in the cases of the three defendants, Guillette, Joost, and Zinni, after determining that a new trial was required in the interest of justice, this Court sua sponte moved that the case be remanded from the Second Circuit Court of Appeals so that a new trial could be provided for said defendants. The appellate court responded by remanding said case on April 18, 1975, and the matter is now before this Court for appropriate action.
"Rule 33 of the Federal Rules of Criminal Procedure provides that within two years after final judgment the defendant may move for a new trial based on the ground of newly discovered evidence in the district court. If the case is on appeal, the district court may certify that if the case is remanded, a new trial will be granted, and the appellate court will generally comply by remanding the case. Rule 33, supra; United States v. Minkoff, 181 F.2d 538 (2d Cir. 1950); see also United States v. Smith, 331 F.2d 145 (6 Cir. 1964) . . .." United States v. Comulada, 340 F.2d 449, 452 (2d Cir. 1965).
Also see, United States v. Frame, 454 F.2d 1136, 1138 (9th Cir. 1972); and United States v. Shelton, 459 F.2d 1005, 1006 (9th Cir. 1972).
It is now a commonly accepted principle of law, that the constitutional requirement of due process is not satisfied, where perjured testimony of a witness would have been reasonably likely to have affected the jury's judgment in determining the credibility of a material witness. Particularly is this true, where the testimony of that witness was *1370 crucial in establishing proof of the elements of the crime charged and the overall circumstances of the testimony offered, bore directly on the guilt or innocence of the commission of the crime itself or could have reduced the penalty for the crime.
"The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. . . .
"`It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth . . ..'" Napue v. Illinois, 360 U.S. 264, 269-270, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).
Also see, Pyle v. Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed.2d 214 (1942).
In this case, there were three separate levels of conspiratorial conduct, in which the trial jury could have found these defendants possibly involved; however, it found each of them guilty of all three. The first count alleged a conspiracy, which resulted in a Government witness' violent death; and the statute covering that office authorized imprisonment up to a life term. The second count involved a simple conspiracy to influence, intimidate and impede a witness, which statute carried only a 5-year penalty. The third count alleged a conspiracy where an explosive was used to influence and injure a witness by force, and this carried a 10-year penalty. The degree of guilt or innocence of each one of these defendants might well depend upon each defendant's individual affirmative conduct by acts, by agreement, or by assent to pay another to commit such acts. It is, of course, conceivable that a defendant might willingly participate in frightening or threatening a witness and yet not have knowledge of the existence of a conspiracy to cause the death of the victim by the use of an explosive. Thus, in this kind of case any shading of informant Housand's testimony by filling in facts, could have essentially affected the jury's ultimate decision of guilt, as it related to each defendant.
If the trial jury had known that Housand had a psychiatric history of deliberately fabricating the truth by using fantastic falsehoods and being a compulsive liar, such facts would likely have had an effect on the ultimate judgment of the jury. Housand's deliberate false denial of past psychiatric examination, evaluation, and treatment, effectively foreclosed defense counsels' inquiry into this sensitive area. Furthermore, the negligent failure on the part of the Government to more carefully scrutinize the military information relating to the informant's past psychiatric history already in its possession, prejudiced the defendants' right to a full disclosure of this information in accordance with the Court's order. The undisclosed evidence was of such a nature that it could have assisted defense counsel in presenting their cases in such a manner, that culpability could have been lessened and reasonable doubt created in the minds of the jurors. The Court finds that there is a reasonable likelihood that the undisclosed information could have materially affected the degree of legal guilt as to the conduct of each defendant; and that it could conceivably have affected the overall outcome of the trial. In making this finding, the Court does not find that there was any willful or deliberate bad faith on the part of the Government prosecutor.
"A new trial is required if `the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . ..'" Giglio v. United States, 405 U.S. 150, *1371 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).
The federal rule requires that relief in the form of a new trial should be granted only under circumstances compelling such action to achieve justice. Under the circumstances disclosed here, this Court is required to set aside the convictions of Guillette, Joost, and Zinni and order a new trial for all three.
". . . [T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963).
Also see, Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1958); United States v. Baldi, 195 F.2d 815 (3d Cir. 1952); and United States v. Keogh, 391 F.2d 138 (2d Cir. 1968).
As Judge Friendly so aptly described the situation in a comparable factual circumstance in United States v. Miller, 411 F.2d 825, 832 (2d Cir. 1969):
"The test, however, is not how the newly discovered evidence concerning the hypnosis would affect the trial judge or ourselves but whether, with the Government's case against Miller already subject to serious attack, there was a significant chance that this added item, developed by skilled counsel as it would have been, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." (footnote omitted).
The truthfulness of informant Housand was continually under attack throughout both trials. In several non-crucial matters his recollection of factual events differed with the testimony of certain officers in the Lincoln, Rhode Island Police Department and two of the agents of the Providence Office of the FBI. In several other particulars, his testimony differed with that of proven credible evidence. In some respects, such as the story of Housand's being kidnapped and held at gunpoint against his will, while he spent several hours writing out a false and defamatory statement[17] against the Lincoln Police Department, at a time when his captors had gone to bed; this testimony approached the fantastic. The question arises, would the jury have believed him in these particulars or would they have believed any of his testimony, had they been advised of the history of his psychiatric problems and the medical-psychiatric evaluation to the effect that he was a person who had a fantastic ability to lie. Was part of his testimony fantasy or was it the whole truth?
Experience teaches trial counsel, that one of the most dangerous witnesses is one who has no hesitancy to "fill in" crucial testimony or to tell half-truths. A supplement to that theorem, however, teaches that the testimony of such a witness can be totally destroyed where adequate background information concerning the witness has been developed and a thorough preparation of the facts carried out. It is for just such a purpose that Jencks Act and Brady material are required by statute and court rule to be disclosed so that defense counsel may not be overtaken by half-truths.
The ten checks, on which informant Housand had pled guilty at the military court martial under the name of John L. Housand which the Government had in its file and failed to disclose, also constituted discoverable Brady material. Housand had repeatedly denied that he *1372 had used the "L" or the middle name "Levon" when questioned by defense counsel. The fact that the Government facesheet did disclose the middle initial, did not compensate for Housand's insistence that the record was in error. The Xerox copy of these checks in the prosecutor's file, constituted the best available contradictory evidence. Through negligent oversight, they were not disclosed by the Government prosecutor.
"A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not `the result of guile,' . . .." Brady v. Maryland, 373 U.S. 83, 87-88, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963).
Also see: Giles v. State, 229 Md. 370, 183 A.2d 359, appeal dismissed, 372 U.S. 767, 83 S.Ct. 1102, 10 L.Ed.2d 137 (1962); Grant v. Alldredge, 498 F.2d 376 (2d Cir. 1974); United States v. Pfingst, 490 F.2d 262, 277 (2d Cir. 1973).
Under similar circumstances, the Second Circuit Court of Appeals in United States v. Badalamente and Yagid, 507 F.2d 12 (2d Cir. 1974). Reversed a conviction, where the Government had suppressed exculpatory material, which had bearing upon the credibility of a Government witness. There the Court said:
". . . [W]e think that as the trial continued after Yagid testified  where his testimony made the credibility of Allen crucial to the determination of Yagid's guilt or innocence  the nonproduction of the Allen letter to the trial judge and the Allen letters to other public officials was a violation of the rule in Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that `the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.
". . . [T]he significance of the letters was evident on their face, and their importance as tools for impeachment of a crucial witness was inescapable."
The Government informant, Housand, was portrayed before the jury by defense counsel, as a career forger and a recidivist criminal with a substantial record. However, had the objective evidence of the ten checks been made available to defense counsel, they might have used them to establish a visible benchmark, against which the true measure in the courtroom of the witness' false testimony could be gauged. A jury usually resents not being told the truth under such circumstances where the factual evidence is clear cut; and they might well have discredited Housand in other essential particulars:
"Appellant's counsel would probably have sought to make this letter the `capstone' of his attack on Lipsky's credibility, cf. United States v. Miller, . . . and argued that it revealed a frantic  even mentally disturbed  person who was ready to tell any lie to anyone in order to save himself from a murder conviction in the state court. Denial of the opportunity to use such forceful impeaching material bearing on the credibility of the government's key witness mandates a new trial." United States v. Pacelli, 491 F.2d 1108, 1119 (2d Cir. 1974) (footnote omitted).

Defendant Zinni
At the original trials of the defendants Guillette and Joost, the defendant Marrapese was called by the defense as a witness, out of the presence of the jury. He invoked his fifth amendment *1373 rights and refused to testify. At the Marrapese and Zinni trial, he was a co-defendant on trial and was not called to testify. However, on February 19, 1975, at the hearing on the motion for a new trial, Marrapese, while represented by counsel, elected to withdraw his pending appeal of conviction in the Second Circuit Court of Appeals and his motion for a new trial in this Court, and proceeded to testify for the Government. He then became the source of new factual information, not otherwise previously available.
It is settled law in this Circuit, that before a sentence may be vacated and a new trial ordered on the grounds of newly discovered evidence, the following elements must be proved:
(1) the evidence must in fact be newly discovered evidence;
(2) the petitioner must not have lacked diligence in obtaining such evidence prior to the conclusion of the trial;
(3) it is not merely cumulative or impeaching;
(4) it is material to the issues; and
(5) it is of such a nature that upon a new trial, it would be likely to produce an acquittal.
United States v. On Lee, 201 F.2d 722, 723, n.3 (2d Cir.), cert. denied, 345 U.S. 936, 73 S.Ct. 798, 97 L.Ed. 1364 (1953); Tropiano v. United States, 323 F.Supp. 964 (D.Conn.1971); Cruz v. United States, No. 15178 (D.Conn.1972).
Marrapese, an associate of the other defendants, openly admitted that he had been engaged in a career of crime over a number of years. He stated that he had been for several years a shop lifter but more recently he had become a "fence," who primarily engaged in the business of buying and selling stolen precious metals, jewels and jewelry. The enormity of his criminal business was disclosed, when he said he grossed "probably two and a half million dollars a year."
He testified to the participation of the defendants Guillette and Joost in the Westerly, Rhode Island armory theft of the M-16 rifles and the transportation of the guns by all four defendants to LaPolla's home in Oneco, Connecticut. He described the events leading up to the alleged May 8, 1972 conspiratorial meeting at Carter's Jewelry Store in Cranston, Rhode Island. However, his version of the meeting placed the defendant Zinni in the connecting office-room between Carter's and American Gold Buyers, Inc., during the conspiratorial discussion. He testified that Zinni continued to vacuum the floor for pieces of glass from the shattered display cases, that had been burglarized a few days previous. He claimed that defendant Zinni did not take an active part in the conspiratorial discussion. However, there is some question in the testimony concerning whether or not he later acquiesced, while in the car with Marrapese on the way to the Providence Superior Court. If Marrapese is to be believed, his testimony could well have material bearing on the degree of guilt applicable to defendant Zinni.
Marrapese admitted his own involvement in the conspiratorial meeting and some of his own overt conduct which was designed to accomplish its purpose. He stated that on September 29, 1972, the day of the bomb explosion and killing, he had just left Attorney Bucci's office, when he met the defendant Guillette and a friend named Sitko. Marrapese testified that Guillette said, "I just left a package for your buddy up there." Marrapese said while he didn't know what it meant at the time, he understood that he was referring to Daniel LaPolla and "up there" meant Oneco, Connecticut.
Marrapese testified to a conversation between himself, Guillette and Sitko in late April or early May, 1973, while the three were having lunch together. Marrapese explained that on this occasion, he was reading in the newspaper about letter-bombs, and expressed the *1374 observation that he was curious as to how they were made. Sitko spoke up and said, "That's the way we should have killed that LaPolla;" and proceeded to explain what a hard time he had had getting the storm window off the rear of LaPolla's home.
Marrapese then told about Guillette's entering the building, while he and "Red" went out front as look-outs. Guillette told them that he climbed through the window and hung up either six or eight sticks of dynamite from a coat hanger running alongside the door. Marrapese also told how Guillette said he had a tough time driving a nail into the floor, while using a pair of pliers. The evidence at trial disclosed the wooden base for the switch and explosive device was nailed to the floor. Marrapese stated that Guillette explained that "they had worn surgeon's gloves, and that they had gotten rid of everything." (Marrapese Tr. 172-173).
The Court finds that Marrapese's testimony, if believed by a jury, could be exculpatory in degree, as to both Zinni and Joost. In either case, it could likely affect the severity of the punishment to be imposed, if the totality of the evidence failed to support a finding of guilt on the indictment's first or third count.
". . . [I]t is clear that the trial judge, in deciding a motion for a new trial on the basis of new evidence, has broad discretion in deciding whether the new evidence is credible. United States v. Johnson, 327 U.S. 106, 111-112, 66 S.Ct. 464, 90 L.Ed. 562 (1946); Jones v. United States, 279 F.2d 433 (4 Cir.), cert. denied sub nom., Princeler v. United States, 364 U.S. 893, 81 S.Ct. 226, 5 L.Ed.2d 190 (1960) . . .." United States v. Maddox, 444 F.2d 148, 152 (2d Cir. 1971).
The Court is satisfied that the newly discovered evidence of the witness and co-conspirator Marrapese would be likely to produce a different result, as to the the defendants Zinni and Joost; and for the overall reasons hereinbefore stated the Court is of the opinion that basic justice requires a new trial as to all three defendants, Guillette, Joost and Zinni. The defendants' motions for a new trial are therefore granted, and it is so ordered.
NOTES
[1] On October 24, 1972, the Court ruled and so ordered that "the Government was under a continuing duty to timely produce Brady material throughout the trial."
[2] Defendants' Exhibit 21Z.
[3] Defendants' Exhibit 20Z.
[4] Government Exhibit 11.
[5] Defendants' Exhibit 23Z; Tr. 208, (February 28, 1975).
[6] Defendants' Exhibit 23Z, pp. 22-33; Coffey Tr. 37, January 13, 1975.
[7] Coffey Tr. 57-58, (January 13, 1975).
[8] Court Exhibit 18.
[9] Defendants' Exhibit 20, Grand Jury Tr. 855.
[10] Defendants' Exhibit 22Z.
[11] Ibid.
[12] Defendants' Exhibits 1Z-6Z, 22Z and 23Z.
[13] Defendants' Exhibit 23Z, pp. 24-28.
[14] Defendants' Exhibit 16, p. 67.
[15] Defendants' Exhibits 35Z, 40Z, 27Z, 33Z, 41Z, 42Z.
[16] Defendants' Exhibit 35Z.
[17] ". . . [I]f I gave these people a statement, indicating in the statement the things they wanted to appear, that I would be released unharmed, and be allowed to go on may way.

"On the other hand, if I did not co-operate with them, I would probably end up in Lincoln Woods." Housand Tr. 696, November 8, 1973.